# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Adler v. Greenfield*, 2013 IL App (1st) 121066**

| | |
|---|---|
| Appellate Court Caption | BARBARA ADLER, Individually and as Special Representative of the Estate of Orrin Adler, MICHAEL HANNA, and FAYE R. ADLER GRAFTON, Plaintiffs-Appellees, v. FRANK M. GREENFIELD and FRANK M. GREENFIELD AND ASSOCIATES, P.C., Defendants-Appellants. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-1066 |
| Filed | May 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a discovery dispute arising in a legal malpractice action alleging that defendants' negligence in failing to follow the estate-planning intentions of defendants' clients resulted in a substantial reduction of plaintiffs' inheritance, the communications between defendants and the bank that handled the clients' estate prior to the death of the surviving client were privileged, but defendants were ordered to produce for *in camera* examination the documents in defendants' privilege log for a determination of whether they are privileged, and the communications after the death of the surviving client were deemed not to be privileged. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-14343; the Hon. Marcia Maras, Judge, presiding. |
| Judgment | Contempt order vacated; discovery order affirmed in part and reversed in part. |

Counsel on
Appeal

Daniel F. Konicek and Michael J. Corsi, both of Konicek & Dillon, P.C., of Geneva, for appellants.

Elliot R. Schiff and Nathan I. Neff, both of Schiff Gorman, LLC, of Chicago, for appellees.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.

Justices Hall and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    The instant appeal concerns a discovery dispute between plaintiffs, the estate of Orrin Adler[1], Barbara Adler, Michael Hanna, and Faye Adler Grafton, and defendants, Frank M. Greenfield and Frank M. Greenfield & Associates, P.C., which arose during litigation of plaintiffs' legal malpractice action against defendants. Plaintiffs, the third-party beneficiaries of a will prepared by defendants, allege that defendants were negligent in failing to follow the intention of the testator and include a certain provision in a will that would have entitled them to a greater inheritance. During the course of discovery, plaintiffs sought information concerning the testator's testamentary intentions, which defendants claimed was shielded by the attorney-client privilege. The trial court ordered defendants to produce documents and provide deposition testimony concerning communications between defendants and their client.

¶ 2    Defendants moved to reconsider the trial court's ruling or, in the alternative, for entry of a contempt order for purposes of seeking review of the discovery order. On reconsideration, the trial court found that defendants' direct communications with their clients were shielded by privilege, but communications through third parties were not; in an attempt to amicably resolve the issue, the trial court ordered plaintiffs to seek the information directly from the third party, a bank. The bank produced a number of documents but also objected to revealing communications between the bank and defendants on behalf of defendants' clients. The trial court conducted an *in camera* inspection of the bank's documents, overruled its objections, and ordered defendants to produce documents. Defendants did not comply and, on March 2, 2012, the trial court entered an order holding defendants in civil contempt and entered a monetary penalty of $100. Defendants appeal, arguing that the trial court erred in finding that communications between defendants and the bank were not privileged. For the reasons that follow, we vacate the contempt order and affirm the trial court's discovery order in part and reverse it in part.

---

[1]Orrin Adler was originally a party to the instant lawsuit, but passed away while the case was ongoing. On May 12, 2011, Barbara Adler was appointed as special representative for his estate for the purpose of continuing the prosecution of the instant lawsuit.

BACKGROUND

I. Greenfield and the Perrys' Estate Planning

¶ 5      The underlying lawsuit in the instant case concerns defendants' actions in preparing estate documents for Leonard and Muriel Perry (collectively, the Perrys). Although the instant appeal concerns the applicability of the attorney-client privilege, for context, we briefly relate the facts as alleged in plaintiffs' complaint and its exhibits.

¶ 6      Defendants, Greenfield and his law firm, represented the Perrys for estate-planning purposes. In connection with the estate planning, Leonard executed a will that poured his assets into a trust known as the "Leonard W. Perry Declaration of Trust"; Muriel did the same with her assets, pouring them into the "Muriel W. Perry Trust Agreement." Leonard died in 2007, and Muriel died on May 2, 2008. Plaintiff Faye Adler Grafton and JP Morgan Chase Bank (JP Morgan) were named as co-executors of Muriel's will and, after Muriel's death, became cotrustees of Muriel's trust.

¶ 7      At the time of Leonard's death, his trust was subdivided into two trusts: a "Marital Trust" and a "Family Trust." The Marital Trust was to provide for Muriel during her life and, upon Muriel's death, any assets remaining in the Marital Trust would be distributed to the Family Trust. The Family Trust was divided into two portions: "Portion A" and "Portion B." Portion A consisted of $99,500, which was to be used to make specific bequests, and Portion B consisted of the remainder of the trust's assets and was to be equally divided among five named beneficiaries. Leonard's trust granted Muriel the power to appoint the Marital Trust's assets from the Family Trust, provided that Muriel specifically did so in her will. Additionally, Muriel was given the power to appoint and redesignate the remainder beneficiaries of the Family Trust.

¶ 8      After Leonard's death in 2007, Greenfield amended Muriel's will to include language "that directed, pursuant to her Power of Appointment of the Leonard W. Perry Trust dated March 22, 1996, that assets in the Leonard W. Perry Trust dated March 22, 1996 were to be distributed according to the terms of the Muriel Perry Trust." In April 2008, Muriel again amended her will, making changes to certain specific bequests of funds in her trust. In creating this will, Greenfield "knew that Muriel W. Perry intended to change certain monies that were to be distributed from the Leonard W. Perry Trust dated March 22, 1996 under her Power of Appointment in accordance with her designation as set forth in the amended Muriel W. Perry Trust." However, in preparing the will, Greenfield "failed to include language that Muriel W. Perry was exercising her Power of Appointment from her deceased husband's trust." This error remained undiscovered until after Muriel's death on May 2, 2008. As a result, certain beneficiaries received more moneys than Muriel intended to give and others received less.

¶ 9      Approximately a month after Muriel's death, Greenfield disclosed his omission of the power of appointment in the 2008 will in a letter to the beneficiaries of the trust.[2] The letter

_____

[2]We considered whether the letter relieved Greenfield's insurance company of the duty to defend him in the instant action in the related case of *Illinois State Bar Ass'n Mutual Insurance Co. v. Frank M. Greenfield & Associates, P.C.*, 2012 IL App (1st) 110337.

provided:

"You are receiving this letter because you are named in the Muriel Perry Trust as a beneficiary. The purpose of this letter is to give you the facts regarding the value of Trust assets and the respective amounts of the distributions. As many of you know, for more than ten years I represented the late Leonard Perry and Muriel Perry in connection with their estate plan and during that time I came to know both of them well. I want to extend my sincere condolences to all the members of your family.

During his lifetime, Leonard Perry transferred his assets into the Leonard Perry Trust. The Leonard Perry Trust provided that upon the death of Leonard Perry the trust funds were to be used for the care, comfort and support of Muriel Perry. The Leonard Perry Trust further provided that Muriel Perry had the right to make changes or modifications to the plan of distribution by virtue of what is referred to as a 'Power of Appointment'. Accordingly, after Leonard died, Muriel had the right to 'appoint' the funds in Leonard's Trust as she wished, which is to say she had the right to make changes and modifications to the plan of distribution as she saw fit.

After the death of Leonard Perry, Muriel Perry executed a Will dated November 30, 2007, (the '2007' Will) in which she directed, pursuant to her Power of Appointment, that assets in the Leonard Perry Trust were to be distributed according to the terms of the Muriel Perry Trust. The effect of exercising the Power of Appointment in the 2007 Will was to change the distributions of trust funds as set forth in the Leonard Perry Trust to the distributions set forth in the Muriel Perry Trust.

Over a period of about a year before her death, I, along with Gary Cueno of JP Morgan Chase Bank, met several times with Muriel Perry for the purpose of discussing modifications she wanted to make to her Trust. During the course of these meetings, it was very clear that Muriel Perry had given much thought to these[ ] changes and they were the product of her careful and well reasoned consideration.

On April 14, 2008, I met with Muriel Perry and reviewed with her in great detail the changes to her Trust, as she had directed. At that meeting she reiterated her conviction that the changes clearly reflected her desire regarding disposition of her assets upon her death. At that meeting, Muriel Perry executed an amendment to the Muriel Perry Trust and she also executed a Last Will and Testament (the '2008 Will'). The 2008 Will contains what is referred to as a 'scrivener's error'. A scrivener is the somewhat old fashion [*sic*] word used to describe the person who writes a document, in this case a Will. I drafted the 2008 Will and inadvertently omitted a provision that had been contained in the 2007 Will.

The reason for the omission does not change the facts, but for your information, the 2008 Will[ ] was prepared by referring to an earlier computer generated version of the document. That earlier computer generated version of the document did not contain the specific language exercising the Power of Appointment. It was an oversight and there is no question that when Muriel Perry signed the 2008 Will she verily believed that the Trustee of her trust would carry out her specific directions.

The difference between the distribution to each beneficiary using the 2007 Will

-4-

(which contains the Power of Appointment language) and the distribution to each beneficiary using the 2008 Will (which does not contain the Power of Appointment language), is detailed on the enclosed schedule titled 'Muriel and Leonard Perry Estate Plan Distribution dated June 2008'. It is important to note that the figures used in the enclosed Muriel and Leonard Estate Plan Distribution are not final and were prepared for illustration purposes only.

The Co-Trustees of the Muriel Perry Trust are JP Morgan Chase Bank and Faye R. Grafton. The Co-Trustees have the obligation to carry out the wishes of Muriel Perry as she intended. There are several possibilities with respect to a course of action under these circumstances. The family members could honor the clearly stated intention of Muriel Perry and agree that distributions be made in accordance with Muriel Perry's Wishes as detailed on the enclosed Muriel and Leonard Perry Estate Plan Disposition. If the family members do not agree to honor the 2007 Will, they could agree to submit the matter to binding arbitration. In the absence of a unanimous agreement, the Co-Trustees would be forced to seek a judicial determination to resolve the scrivener's error. A judicial determination would involve all 27 beneficiaries and their respective lawyers and would be a costly and lengthy procedure.

I encourage you to promptly seek the advice of your individual attorney. Both myself and Gary Cueno are available to respond to inquiries from you or your attorney. The decision as to whether there will be a unanimous family agreement is something the Co-Trustees and all of you need to know as soon as possible.

I knew Leonard and Muriel Perry as two of the kindest, most gentle and caring people I have ever met. I am distressed about this situation and I am hopeful it can be resolved in a manner that pays homage to their memory. It should be understood that my position is to honor the wishes of Muriel Perry and I will fully cooperate with her family to achieve this goal.

I look forward to your early response."

The letter included as an enclosure a document[3] that compared the distribution of the trust funds under "Muriel's Wishes" and under the "Current Estate Plan w/Scrivener's Error." Plaintiffs received a total of $863,900 less under the "Current Estate Plan w/Scrivener's Error" than they would have under "Muriel's Wishes."

¶ 10                                    II. Procedural Posture

¶ 11    On November 23, 2009, plaintiffs filed a complaint against defendants for legal malpractice, claiming that Greenfield was negligent in failing to include the power of appointment provision in Muriel's will and that as a result of that omission, they "have been deprived of monies for which they were the intended beneficiaries"; the complaint was amended on May 11, 2010, to add an exhibit. On February 1, 2010, defendants filed a motion

---

[3]The record indicates that the document was not prepared by Greenfield but was prepared for JP Morgan.

-5-

to strike and dismiss plaintiffs' complaint pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-615, 2-619 (West 2008)), claiming that plaintiffs' complaint impermissibly sought to alter Muriel's unambiguous will through the use of extrinsic evidence. On May 3, 2010, the trial court denied defendants' motion.

¶ 12    On June 10, 2010, plaintiffs filed several discovery requests, including requests to admit, requests for production of documents, interrogatories, and a notice of deposition for Greenfield; the requests to admit in large part parroted the language of the letter Greenfield sent to the beneficiaries in which he disclosed the error in Muriel's will.

¶ 13    On July 28, 2010, plaintiffs filed a motion to deem facts admitted, which was granted on September 24, 2010.

¶ 14    On September 16, 2010, defendants filed a motion for summary judgment, arguing that the inclusion of the provision in Muriel's will would not have been effective because plaintiffs were not Muriel's or Leonard's lineal descendants, as required by Leonard's trust. The motion was noticed for a hearing on September 24, 2010, but was not heard on that date.[4]

¶ 15    At some point,[5] defendants provided plaintiffs with a privilege log, detailing 49 documents that were being withheld, claiming attorney-client privilege. The privilege log indicated that these documents consisted of correspondence with the Perrys, correspondence with individuals from JP Morgan, drafts of estate documents, and Muriel's bank records.

¶ 16    On December 17, 2010, plaintiffs filed a motion for relief pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002), asking the trial court to overrule the objections made by defendant Greenfield's counsel during Greenfield's November 22, 2010, discovery deposition and to order Greenfield produced for a second deposition, with defendants to bear the costs as a discovery sanction. Plaintiffs indicated that one of the grounds for defendants' objections was that communications between Greenfield and JP Morgan were shielded from discovery by the attorney-client privilege.

¶ 17    On December 22, 2010, defendants again filed their motion for summary judgment.

¶ 18    On January 7, 2011, the trial court granted plaintiffs' motion, overruling defendants' objections and ordering Greenfield to be re-produced for a second deposition. In the same order, the court entered and continued defendants' motion for summary judgment until after plaintiffs had taken discovery necessary to respond to the motion for summary judgment.

¶ 19    On February 7, 2011, plaintiffs filed another motion for relief pursuant to Rule 219(c), asking the trial court to strike defendants' answer and affirmative defenses and enter default

---

[4]Plaintiffs' brief indicates that the trial court refused to permit defendants to file their motion because defendants had yet to comply with outstanding discovery.

[5]Defendants' response to one of plaintiffs' motions for sanctions indicates that defendants answered plaintiffs' written discovery on October 4, 2010, but the documents in the record on appeal are not dated.

judgment in plaintiffs' favor.[6] The motion stated that in plaintiffs' notice of deposition for Greenfield's second deposition, Greenfield was requested to bring his litigation file to the deposition, including all of his communications with anyone from JP Morgan. However, defendants' counsel sent a fax to plaintiffs' counsel indicating that Greenfield would not produce his file as it related to his communications with JP Morgan, nor would counsel permit him to answer questions about such communications. Plaintiffs claimed that, since the trial court had already overruled defendants' objections, their position concerning communications with JP Morgan constituted civil contempt.

¶ 20 On February 10, 2011, while plaintiffs' Rule 219(c) motion was pending, defendants filed a motion to reconsider part of the trial court's January 7, 2011, order, arguing that their communications directly with the Perrys were privileged, as were the communications that occurred indirectly through JP Morgan, which was the Perrys' trustee and fiduciary. Defendants asked the trial court to reconsider its order and vacate it to the extent that it required disclosure of protected information. In the alternative, defendants indicated that they would refuse to produce the protected information and requested the imposition of a nominal monetary contempt sanction so as to permit an immediate appeal.

¶ 21 On March 9, 2011, the trial court ruled on both plaintiffs' motion for relief pursuant to Rule 219(c) and defendants' motion to reconsider. The court granted defendants' motion in part, as to the communications directly with the Perrys, and denied it in part, as to the communications with JP Morgan. The court also gave defendants until March 24, 2011, to produce the documents requested by plaintiffs and continued the matter to that date to determine if further relief to plaintiffs under Rule 219 was necessary. On March 24, 2011, the trial court gave defendants until March 31 to produce the requested materials and continued the matter until that date.

¶ 22 On March 31, 2011, the trial court ordered plaintiffs to issue a subpoena to JP Morgan for all documents and communications identified in the court's March 9 and March 24 orders; although there is no transcript of the hearing in the record on appeal, a later Rule 219(c) motion by plaintiffs indicates that the trial court entered this order seeking "an amicable resolution which would avoid the entry of a contempt order." The court ordered JP Morgan to comply with the subpoena by April 21, 2011, and ordered Greenfield to produce an affidavit identifying any documents in defendants' possession not previously produced by defendants and not produced by JP Morgan. The court reserved the right to perform an *in camera* review of the documents, and set the matter for a status hearing on May 12, 2011.

¶ 23 The matter was continued several times until, on June 22, 2011, plaintiffs filed a renewed motion for relief under Rule 219(c) and a motion for rule to show cause as to why JP Morgan should not be held in contempt. The motion claimed that defendants continued to refuse to produce the requested documents and that JP Morgan had withheld a number of documents as protected by the attorney-client privilege. Attached to the motion was, *inter alia*, an email dated June 15, 2011, from JP Morgan's counsel to plaintiffs' counsel, indicating that JP Morgan could not produce some of the requested documents because they were privileged.

---

[6]The motion refers to several exhibits, but the exhibits do not appear in the record on appeal.

The motion also included JP Morgan's privilege log consisting of 144 documents; 15 of those documents involved communications with Greenfield and the remainder involved communications with other counsel.

¶ 24      On July 8, 2011, before the trial court, counsel for JP Morgan indicated that it had produced nearly 7,000 pages in response to plaintiffs' subpoena but that some of the requested documents were privileged. The trial court entered an order entering and continuing plaintiffs' motions and ordering JP Morgan to produce all of the documents it claimed were privileged for an *in camera* inspection.

¶ 25      On July 26, 2011, the trial court sustained JP Morgan's objections in part and overruled its objections in part, ordering JP Morgan to produce certain documents by July 28, 2011. JP Morgan's objections were sustained with regard to communications with its own counsel, but were overruled with regard to communications with Greenfield.

¶ 26      On July 28, 2011, the trial court entered an order overruling defendants' objections to disclosing communications between Greenfield and JP Morgan on the basis of attorney-client privilege and ordered Greenfield to produce himself for a deposition and to answer questions concerning such communications; Greenfield was also ordered to produce any records of such communications. The court further ordered that the motion for rule to show cause against JP Morgan be withdrawn as moot, since it had overruled JP Morgan's objections to disclosing communications between JP Morgan and Greenfield and had ordered JP Morgan to produce those documents, which it had done. The court entered and continued plaintiffs' Rule 219(c) motion to August 31, 2011.

¶ 27      On November 2, 2011, the trial court[7] ordered counsel for both parties to provide all briefs, orders, and relevant material relating to defendants' production and withholding of documents and continued the matter to December 7, 2011, for status and consideration of the production issues.

¶ 28      On December 1, 2011, defendants filed a motion to set a briefing schedule on their motion for summary judgment.

¶ 29      On January 6, 2012, plaintiffs filed a motion for relief under Rule 219(c) and for an order holding defendants in civil contempt of court for failure to comply with the trial court's orders of January 7, 2011; March 24, 2011; July 26, 2011; and July 28, 2011. Plaintiffs recounted the procedural history of the case, especially the discovery issues, and noted that defendants were in willful noncompliance with four court orders. Accordingly, plaintiffs asked the trial court to strike defendants' pleadings, enter judgment in plaintiffs' favor, bar defendants from offering evidence, and hold defendants in civil contempt for their intentional refusal to comply with numerous court orders.

¶ 30      On January 20, 2012, defendants filed a response to plaintiffs' motion, asking the court to either deny plaintiffs' motion or find defendants in contempt and enter a nominal monetary sanction so that defendants could seek review of the rulings concerning the applicability of

---

[7]The case was initially assigned to Judge Jennifer Duncan-Brice, but was reassigned to Judge Marcia Maras following Judge Duncan-Brice's retirement at the end of July 2011.

the privilege. The response indicated that defendants had withheld as privileged 22 documents concerning communications between Greenfield and third parties, five of which had been produced by JP Morgan, leaving 17 documents comprising 53 pages at issue.

¶ 31 On March 2, 2012, the parties came before the trial court on plaintiffs' motion. The trial court clarified that plaintiffs were requesting sanctions for defendants' noncompliance with the court's orders concerning communications between Greenfield and third parties such as JP Morgan, and not concerning communications directly between Greenfield and the Perrys, which the former judge found to be privileged. The trial court further clarified that, by finding the communications with JP Morgan not to be privileged, the former judge necessarily impliedly found that JP Morgan was not an agent of the Perrys because if it was, the communications through JP Morgan would also be privileged.

¶ 32 After extensive argument, the trial court found that any sanction for noncompliance with court orders would begin with the July 28, 2011, court order, since up to that point, the trial court had issued a number of orders attempting to resolve the issue, such as ordering plaintiffs to seek the requested documents from JP Morgan, which the court found sent "mixed signals." The court further found that the issues in the case concerned an unusual application of the attorney-client privilege, and that the privilege question should be resolved prior to moving forward. The court noted that none of the cases cited by plaintiffs to support imposing severe sanctions involved the question of the applicability of the attorney-client privilege, which was the reason for the order being disobeyed in the instant case. Finally, the court noted that "they're refusing–it's a direct, clear order to produce Mr. Greenfield and the records with regard to JP Morgan. They're saying they're not going to, so that's deliberate and contumacious and I'm holding them in contempt at this point, which is an appealable order under the 300 series of the Supreme Court rules," and imposed a monetary sanction of $100.

¶ 33 On March 30, 2012, defendants filed a notice of appeal, listing six orders that it was appealing. On May 10, 2012, we granted plaintiffs' motion to strike the notice of appeal in part, striking the notice of appeal for all orders other than the orders of July 28, 2011, and March 2, 2012.

¶ 34 A supplemental record filed before this court on December 6, 2012, includes a number of documents that were produced by JP Morgan as a result of the trial court's order. The supplemental record contains letters from Greenfield and individuals at JP Morgan that demonstrate that JP Morgan and Greenfield communicated with each other and the Perrys about questions and changes to Muriel's estate documents, as well as billing records that indicate that Greenfield met with Muriel and individuals from JP Morgan to discuss her estate. For instance, a letter dated March 25, 1997, from Gary Cueno, a vice president at JP Morgan, to Greenfield states: "In our discussions, Mrs. Perry thought that their condominium should be titled in the name of the Muriel W. Perry Trust Number 32296. Could you please check your files and let me know if the condominium should be titled in the name of Muriel's Trust and if so, whether the title change has been made. I have the 1986 title documents and would be happy to forward them to you." In a subsequent letter to Muriel, Cueno wrote: "As we discussed, Rose from Frank Greenfield's office examined their files and assured me that your Skokie condominium is titled in the name of your trust. Enclosed

is a copy of the Quit Claim Deed that Rose faxed to me reflecting the title change to your Trust. It looks fine to me."

¶ 35    Likewise, in 1998, Cueno wrote to Greenfield: "As you may know, [JP Morgan][8] has been assisting Mr. and Mrs. Perry with their investments over the past couple of years. A few weeks ago we met with Mr. and Mrs. Perry to review their estate plan. They decided to make a few changes to their Wills and Trusts as follows ***." Cueno's letter then listed specific articles of the Perrys' respective wills and trusts and changes to be made to each, including changes in specific bequests, beneficiaries, and successor trustees to their trusts. The letter concluded: "Frank, Mr. and Mrs. Perry would like to have the above changes made as soon as possible. Please do not hesitate to contact either the Perry's [sic] or me if you have any questions."

¶ 36    Cueno wrote a similar letter to Greenfield in 2004: "As you know, [JP Morgan] and I have been assisting Mr. and Mrs. Perry with their financial affairs for the past eight years. Last weekend I met with the Perry's [sic] to review their estate plan. They decided to make a few changes to their estate plan as follows ***." Again, Cueno's letter then listed specific articles of the Perrys' trusts and changes to be made, including changes in specific bequests and the addition of a limited testamentary power of appointment. The letter also asked Greenfield to prepare updated property powers of attorney and health care powers of attorney. The letter continued: "Please review the documents and feel free to make any other modifications based on changes in the law or circumstances. Leonard is currently 93 years old and Muriel is a few years younger. We discussed making charitable bequests but the Perrys decided to make any such relatively modest gifts during their lifetime instead." The letter concluded: "Leonard and Muriel would like to have the above changes made at your earliest convenience. Please do not hesitate to contact either Muriel or me if you have any questions or would like to discuss. It would probably be best if you send the revised documents to me for review. We will likely execute the new documents at their Skokie residence. If you want, I can supervise and witness the execution of the documents."

¶ 37    In 2006, Cueno wrote another letter to Greenfield, stating: "At long last I'm getting back to you regarding the estate plans of Leonard and Muriel Perry. As you may recall, you prepared an amendment to Leonard and Muriel Perry's trusts reflecting the dispositive changes they wanted made at the time in their respective estates (copy enclosed). Leonard and Muriel did not execute the amendments since they decided to make further changes to the dispositive provisions. *** With this in mind, kindly draft the necessary documents to make the following changes to both Leonard's and Muriel's estate plans." The letter then listed specific articles in the Perrys' respective wills and trusts and changes to be made to each, and concluded in the same way as the previous letters.

¶ 38                                                      ANALYSIS

¶ 39    On appeal, defendants argue that the trial court should not have overruled defendants' objections to the disclosure of communications between Greenfield and JP Morgan because

---

[8]First Chicago, the company named in the letter, was a predecessor to JP Morgan. For the sake of consistency, we refer to JP Morgan throughout.

those communications were shielded from discovery by the attorney-client privilege. Generally, a trial court's discovery orders are not appealable because they are not final orders. *Norskog v. Pfiel*, 197 Ill. 2d 60, 69 (2001). However, "it is well settled that the correctness of a discovery order may be tested through contempt proceedings." *Norskog*, 197 Ill. 2d at 69 (citing *Eskandani v. Phillips*, 61 Ill. 2d 183, 194 (1975)). See also *Lama v. Preskill*, 353 Ill. App. 3d 300, 304 (2004) ("contempt proceedings may be used to test the correctness of a discovery order" (citing *Norskog*, 197 Ill. 2d at 69)); *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 444 (2002) ("A contempt proceeding is an appropriate method for a party to test the correctness of an otherwise unreviewable pretrial discovery order." (citing *Lewis v. Family Planning Management, Inc.*, 306 Ill. App. 3d 918 (1999))). When a party appeals civil contempt sanctions imposed for violating a pretrial discovery order, review of the contempt finding necessarily requires review of the order on which it was based. *Norskog*, 197 Ill. 2d at 69; *Lama*, 353 Ill. App. 3d at 304.

¶ 40     Rulings on discovery matters are generally reviewed for an abuse of discretion. *Sterling Finance*, 336 Ill. App. 3d at 446. "A trial court, however, lacks the discretion to compel the disclosure of information that is privileged." *Sterling Finance*, 336 Ill. App. 3d at 446 (citing *In re Marriage of Daniels*, 240 Ill. App. 3d 314, 324 (1992)). The question of whether a privilege exists is a question of law that we review *de novo*. *Lama*, 353 Ill. App. 3d at 305; *Sterling Finance*, 336 Ill. App. 3d at 446. *De novo* consideration means we perform the same analysis that a trial court would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 41     In the case at bar, defendants claim that communications between Greenfield and JP Morgan concerning Muriel's estate are shielded from discovery by the attorney-client privilege. The Illinois Supreme Court, in defining the attorney-client privilege, has stated that: "(1) where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are permanently protected, (7) from disclosure by himself or the legal advisor, (8) except the protection be waived." *Illinois Education Ass'n v. Illinois State Board of Education*, 204 Ill. 2d 456, 467 (2003) (citing *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000), *In re Himmel*, 125 Ill. 2d 531, 541 (1988), and *People v. Adam*, 51 Ill. 2d 46, 48 (1972)). The purpose of the privilege is "to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 117-18 (1982). However, because the privilege poses a bar to the discovery of relevant and material facts, it is an exception to the general duty to disclose and is interpreted narrowly. *Consolidation Coal*, 89 Ill. 2d at 118.

¶ 42     "Before an attorney can be compelled to disclose client information, the party opposing the attorney-client privilege must first establish that the information is not privileged." *In re Marriage of Decker*, 153 Ill. 2d 298, 321 (1992). We first consider whether the attorney-client privilege applies to communications between Greenfield and JP Morgan and, if so, then consider whether the privilege has been waived.

## I. Availability of Privilege

¶ 44　Here, there is no dispute that Greenfield's clients for purposes of the attorney-client privilege are the Perrys, and, accordingly, the trial court found that direct communications between Greenfield and the Perrys were privileged, a finding that is not challenged on appeal. However, defendants claim that communications between Greenfield and JP Morgan concerning Muriel's estate are also privileged because JP Morgan was acting as Muriel's agent during those communications. Generally, matters disclosed to a third party or in the presence of a third party are not privileged, unless the third party is the agent of either the attorney or the client. *Illinois Education Ass'n*, 204 Ill. 2d at 468; *Himmel*, 125 Ill. 2d at 542. If the third party is considered to be an agent of the client, communications made to the client's attorney through the third party will generally be privileged. *Lama*, 353 Ill. App. 3d at 306. "When an agent communicates with the principal's attorney, the agent speaks as the client, or principal, and his or her communications are protected to the same extent as though the principal was speaking." *Lama*, 353 Ill. App. 3d at 306. Consequently, for the communications between JP Morgan and Greenfield to be privileged, we must first find that JP Morgan was acting as Muriel's agent during the communications.

¶ 45　In order to determine whether JP Morgan was acting as Muriel's agent, we must first identify the communications at issue. Defendants focus on the documents listed in their privilege log, which include 17 documents comprising 53 pages, all of which were drafted prior to Muriel's death on May 2, 2008. Plaintiffs, on the other hand, focus on Greenfield's refusal to answer questions during his deposition and seek discovery on Greenfield's communications with JP Morgan both before and after Muriel's death. Thus, the communications at issue fall within two broad categories: communications taking place prior to Muriel's death and communications taking place after Muriel's death.

## A. Communications Prior to Muriel's Death

¶ 47　With regard to communications occurring prior to Muriel's death, we find that JP Morgan was acting as Muriel's agent. The record contains several documents that were produced by JP Morgan that are instructive on the issue. There are letters from Greenfield and individuals at JP Morgan that demonstrate that JP Morgan and Greenfield communicated with each other and the Perrys about questions and changes to Muriel's estate documents, as well as billing records that indicate that Greenfield met with Muriel and individuals from JP Morgan to discuss her estate. For instance, a letter dated March 25, 1997, from Gary Cueno, a vice president at JP Morgan, to Greenfield states: "In our discussions, Mrs. Perry thought that their condominium should be titled in the name of the Muriel W. Perry Trust Number 32296. Could you please check your files and let me know if the condominium should be titled in the name of Muriel's Trust and if so, whether the title change has been made. I have the 1986 title documents and would be happy to forward them to you." In a subsequent letter to Muriel, Cueno wrote: "As we discussed, Rose from Frank Greenfield's office examined their files and assured me that your Skokie condominium is titled in the name of your trust. Enclosed is a copy of the Quit Claim Deed that Rose faxed to me reflecting the title change to your Trust. It looks fine to me."

¶ 48 Likewise, in 1998, Cueno wrote to Greenfield: "As you may know, [JP Morgan] has been assisting Mr. and Mrs. Perry with their investments over the past couple of years. A few weeks ago we met with Mr. and Mrs. Perry to review their estate plan. They decided to make a few changes to their Wills and Trusts as follows ***." Cueno's letter then listed specific articles of the Perrys' respective wills and trusts and changes to be made to each, including changes in specific bequests, beneficiaries, and successor trustees to their trusts. The letter concluded: "Frank, Mr. and Mrs. Perry would like to have the above changes made as soon as possible. Please do not hesitate to contact either the Perry's [*sic*] or me if you have any questions."

¶ 49 Cueno wrote a similar letter to Greenfield in 2004: "As you know, [JP Morgan] and I have been assisting Mr. and Mrs. Perry with their financial affairs for the past eight years. Last weekend I met with the Perry's [*sic*] to review their estate plan. They decided to make a few changes to their estate plan as follows ***." Again, Cueno's letter then listed specific articles of the Perrys' trusts and changes to be made, including changes in specific bequests and the addition of a limited testamentary power of appointment. The letter also asked Greenfield to prepare updated property powers of attorney and health care powers of attorney. The letter continued: "Please review the documents and feel free to make any other modifications based on changes in the law or circumstances. Leonard is currently 93 years old and Muriel is a few years younger. We discussed making charitable bequests but the Perrys decided to make any such relatively modest gifts during their lifetime instead." The letter concluded: "Leonard and Muriel would like to have the above changes made at your earliest convenience. Please do not hesitate to contact either Muriel or me if you have any questions or would like to discuss. It would probably be best if you send the revised documents to me for review. We will likely execute the new documents at their Skokie residence. If you want, I can supervise and witness the execution of the documents."

¶ 50 In 2006, Cueno wrote another letter to Greenfield, stating: "At long last I'm getting back to you regarding the estate plans of Leonard and Muriel Perry. As you may recall, you prepared an amendment to Leonard and Muriel Perry's trusts reflecting the dispositive changes they wanted made at the time in their respective estates (copy enclosed). Leonard and Muriel did not execute the amendments since they decided to make further changes to the dispositive provisions. *** With this in mind, kindly draft the necessary documents to make the following changes to both Leonard's and Muriel's estate plans." The letter then listed specific articles in the Perrys' respective wills and trusts and changes to be made to each, and concluded in the same way as the previous letters.

¶ 51 Thus, the record demonstrates that JP Morgan, and Cueno specifically, was acting as Muriel's agent during communications with Greenfield. Accordingly, communications between JP Morgan as Muriel's agent and Greenfield are privileged as though the communications were directly between Muriel and Greenfield. See *Lama*, 353 Ill. App. 3d at 306 ("When an agent communicates with the principal's attorney, the agent speaks as the client, or principal, and his or her communications are protected to the same extent as though the principal was speaking."). Plaintiffs argue that JP Morgan was not acting as Muriel's agent but was acting on behalf of the trust, its client. We do not find this argument persuasive. The documents produced by JP Morgan indicate that Cueno dealt with the Perrys

and Greenfield about the Perrys' estate planning as a whole, not solely about the trusts.

¶ 52   However, we note that only those communications that fall within the parameters of the attorney-client privilege are shielded from discovery. In the case at bar, defendants have not presented the documents in their privilege log to the trial court for an *in camera* review, and the privilege log itself is not detailed enough to demonstrate that the documents are privileged. Consequently, defendants must provide the documents to the trial court, in order for the trial court to determine whether the documents are properly protected by the privilege.

¶ 53                      B. Communications After Muriel's Death

¶ 54   With regard to communications after Muriel's death on May 2, 2008, we find that the communications are not privileged. During oral argument, defendants' counsel conceded that any privileged communications would have needed to occur prior to Muriel's death and that communications after her death were not privileged. Moreover, even if defendants' counsel had not conceded the issue, we would reach the same result. Defendants' entire argument concerning the applicability of the privilege rests on the argument that JP Morgan was Muriel's agent; defendants do not argue that JP Morgan itself was Greenfield's client. As noted above, we agree that JP Morgan acted as Muriel's agent in communicating with Greenfield about Muriel's estate plan. However, under agency principles, the death of the principal terminates the authority of the agent. *Washington v. Caseyville Health Care Ass'n*, 284 Ill. App. 3d 97, 101 (1996) (citing Restatement (Second) of Agency § 120 (1957)). Accordingly, even if JP Morgan was Muriel's agent during her lifetime, its agency ended at her death. At that point, JP Morgan was acting as trustee of Muriel's trust and communications with it would not be protected by Muriel's attorney-client privilege. Therefore, the trial court properly overruled defendants' objections to communications between Greenfield and JP Morgan occurring after Muriel's death on May 2, 2008.

¶ 55                              II. Waiver of Privilege

¶ 56   Since we have determined that some of the communications between Greenfield and JP Morgan are privileged, we next consider whether the privileged has been waived. Plaintiffs argue that the privilege has been waived in two ways. First, plaintiffs argue that Greenfield could not assert the privilege since he was not the client and that plaintiff Faye Adler-Grafton, the cotrustee of Muriel's estate, was the only person who could assert or waive the privilege. Second, plaintiffs argue that even if there was a privilege, it was waived because Greenfield's conduct was at issue in the litigation.

¶ 57   In arguing that the privilege was waived, plaintiffs claim that Greenfield "bears the burden of establishing not only the existence of the relationship giving rise to the privilege, but also his right to exercise it and its applicability to the facts." However, as noted, "[b]efore an attorney can be compelled to disclose client information, the party opposing the attorney-client privilege must first establish that the information is not privileged." *Decker*, 153 Ill. 2d at 321. Accordingly, as the party seeking disclosure, plaintiffs bear the burden of establishing that the privilege is not applicable.

¶ 58                                    A. Holder of the Privilege

¶ 59        Plaintiffs argue that Greenfield was not entitled to assert the privilege because he was not
the client. Instead, they argue that, as trustee of Muriel's estate, plaintiff Faye Adler Grafton
held the privilege and could choose to assert or waive it. As an initial matter, we note that
plaintiffs have not supported their argument with citation to legal authority, which results in
the waiver of the argument on appeal. See *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("A
point raised in a brief but not supported by citation to relevant authority *** is therefore
forfeited."); *Lozman v. Putnam*, 379 Ill. App. 3d 807, 824 (2008). See also Ill. S. Ct. R.
341(h)(7) (eff. Jul. 1, 2008). However, notwithstanding plaintiffs' waiver, we choose to
address their argument.

¶ 60        We do not find plaintiffs' argument that Adler Grafton held the privilege on behalf of
Muriel's estate to be persuasive. It is well established, as plaintiffs do not dispute, that the
attorney-client privilege survives the death of the client. See *Hitt v. Stephens*, 285 Ill. App.
3d 713, 717 (1997). "The only context in which a client's death might affect the viability of
the privilege is a will contest. [Citations.] The theory underlying this limited exception is that
a decedent would (if one could ask him) waive the privilege in order that the distribution
scheme he actually intended be put into effect." *Hitt*, 285 Ill. App. 3d at 717-18.

¶ 61        In the case at bar, it is important to note that the instant action is *not* a will contest.
Plaintiff Faye Adler Grafton, in her capacity as co-executor of Muriel's will, sought to admit
Muriel's 2007 will to probate instead of the 2008 will; however, the probate court denied the
motion and admitted Muriel's 2008 will to probate. The question of which will governs has
been answered and is not before us. Instead, the action before us is a separate action, in the
law division and not in the probate division, for legal malpractice, brought by beneficiaries
in their individual capacities against Greenfield and his law firm. Indeed, Muriel's estate is
not a party to the action.[9] Thus, the exception to the privilege in the context of a will contest
does not apply here.

¶ 62        Likewise, we cannot find that plaintiff Adler Grafton, as cotrustee of the estate, has the
right to assert or waive the privilege. Plaintiffs argue that after an attorney's client dies, the
attorney's duty extends to the client's estate, meaning that any right to assert the attorney-
client privilege on behalf of the estate would be Adler Grafton's to exercise as cotrustee.
However, plaintiffs have pointed to no case law, and we have discovered none, that would
permit a trustee to assert or waive a decedent's privilege outside the context of a will contest.
Indeed, the only similar case finds otherwise. In *Hitt*, the plaintiffs, relatives and the sole
heirs of a deceased couple, brought a replevin action to recover the couple's estate files from
the defendants' law firm. *Hitt*, 285 Ill. App. 3d at 714. The law firm claimed, *inter alia*, that

---

[9]In fact, it is not clear whether plaintiff Adler Grafton would have standing to proceed in the
instant lawsuit if she was acting in her representative capacity as cotrustee of the estate instead of
in her individual capacity as a beneficiary, since the alleged injury was to the beneficiaries'
individual bequests under the will. See *In re Estate of Wagner*, 184 Ill. App. 3d 882, 885 (1989)
(noting "the general principle that an administrator may not appeal in his representative capacity
from an order affecting his personal rights as an heir or legatee").

the documents were protected by the attorney-client privilege, and the Fourth District Appellate Court agreed. The court noted that the attorney-client privilege survives the death of the client, except in the case of a will contest. *Hitt*, 285 Ill. App. 3d at 717. The court, however, noted that the case was not a will contest and that the estates had been closed for a number of years; thus, the court found that the theory underlying the will-contest exception did not apply. *Hitt*, 285 Ill. App. 3d at 718. The court disagreed with the plaintiffs' argument that there must always be someone who is able to waive the privilege, stating that such a rule could discourage communications between a client and his attorney since "[e]state planning is an extremely personal and private endeavor, and may be based on considerations one would prefer never to reveal." *Hitt*, 285 Ill. App. 3d at 718.

¶ 63    In the case at bar, the instant action is not a will contest. Accordingly, any communication between Muriel, or her agents, and Greenfield remains privileged.

¶ 64                                    B. "At Issue" Exception

¶ 65    Plaintiffs' second argument for waiver is that Greenfield's conduct is at issue in the instant litigation, thereby waiving the privilege. The attorney-client privilege may be waived "as to a communication put 'at issue' by a party who is a holder of the privilege." *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 394 (2002); see also *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 35; *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 585 (2000) (finding client placed attorney's advice at issue when it sued for legal malpractice). Plaintiffs claim that, since Greenfield's conduct is at issue in the instant litigation, the privilege is waived. We do not find this argument persuasive.

¶ 66    Greenfield, as the attorney, is not the holder of the attorney-client privilege. "It is well established that the privilege belongs to the client, rather than the attorney, although the attorney asserts the privilege on behalf of his client. Thus, only the client may waive this privilege." *In re Marriage of Decker*, 153 Ill. 2d 298, 313 (1992); see also *Center Partners*, 2012 IL 113107, ¶ 35. Accordingly, since Greenfield is not the client, he may not waive the privilege by placing his conduct at issue.

¶ 67    We find plaintiffs' reliance on *Lama* to be unpersuasive. *Lama* concerned a medical malpractice claim in which the defendant doctor claimed that the action was time-barred because the plaintiff knew of the doctor's allegedly negligent conduct more than two years prior to the filing of the lawsuit. *Lama*, 353 Ill. App. 3d at 302. The doctor sought discovery of communications between the plaintiff and her attorney, and the plaintiff objected on the basis of the attorney-client privilege. *Lama*, 353 Ill. App. 3d at 303. The Second District Appellate Court found that the attorney-client privilege was waived because, in her complaint, plaintiff had alleged facts about when she learned of her injury, thereby placing it at issue. *Lama*, 353 Ill. App. 3d at 306.

¶ 68    In the case at bar, however, the action is not being brought by Greenfield's client, as was the case in *Lama*, but is being brought by the beneficiaries of Muriel's will. Thus, *Lama* is inapposite.

¶ 69    Additionally, we note that the Illinois Supreme Court discussed the "at issue" exception to the attorney-client privilege in *Fischel & Kahn*. In that case, a law firm filed a complaint

against its client for payment of legal fees, and the client filed a counterclaim alleging legal malpractice. *Fischel & Kahn*, 189 Ill. 2d at 582. In discussing the attorney-client relationship, the Supreme Court noted that "it is undisputed that [the client], by counterclaiming against [the law firm] for legal malpractice, has placed [the law firm's] advice at issue and has waived the attorney-client privilege with respect to communications between it and [the law firm.]" *Fischel & Kahn*, 189 Ill. 2d at 585. Notably, our supreme court indicated that it was the client's action in filing the countersuit that placed the advice at issue, not the law firm's initial suit for legal fees. This supports our conclusion that it is the client, not the attorney, that places the attorney's advice at issue for purposes of waiving the privilege. Accordingly, we cannot find that Greenfield waived the privilege by placing his conduct at issue.

¶ 70                                    III. Contempt Order

¶ 71        Finally, we must consider the propriety of the trial court's contempt order. Defendants request that, if we affirm the trial court's discovery order, we affirm the contempt order for the purpose of preserving further review. This is not required. The purpose of civil contempt is to compel compliance with court orders, not to punish. *County of Cook v. Lloyd A. Fry Roofing Co.*, 59 Ill. 2d 131, 135 (1974). It is to compel the contemnor to act. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43, 44 (1990). It is remedial in nature. *Betts*, 200 Ill. App. 3d at 43-44. A civil contempt proceeding is a proper method for testing the correctness of a pretrial discovery order. *Sterling Finance*, 336 Ill. App. 3d at 444, 456; *Janousek v. Slotky*, 2012 IL App (1st) 113432.

¶ 72        A finding of contempt against an attorney will not stand if the attorney acted in good faith to serve his client and the court. *People v. Siegel*, 94 Ill. 2d 167, 171 (1983). Although we find that the communications between Greenfield and JP Morgan occurring after Muriel's death are not privileged, we find that defendants acted in good faith to serve their client.

¶ 73                                    CONCLUSION

¶ 74        We find that the communications between Greenfield and JP Morgan that occurred prior to Muriel's death on May 2, 2008, and concerning Muriel's estate are shielded from discovery by the attorney-client privilege. Defendants are ordered to produce the documents in their privilege log to the trial court for an *in camera* determination of whether the documents are privileged. We further find that the communications between Greenfield and JP Morgan that occurred after Muriel's death on May 2, 2008, are not privileged. However, we find that defendants acted in good faith to serve their client and the court and, accordingly, we vacate the contempt order in its entirety and affirm the trial court's discovery order in part and reverse it in part

¶ 75        Contempt order vacated; discovery order affirmed in part and reversed in part.