2020 IL App (1st) 190710-U

Nos. 1-19-0710

Order filed January 23, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| BMM NORTH AMERICA, INC. D/B/A BMM TESTLABS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 L 2587 |
| THE ILLINOIS GAMING BOARD and GAMING LABORATORIES INTERNATIONAL, LLC, | ) ) ) | |
| Defendants | ) ) | |
| (Gaming Laboratories International, LLC, Defendant-Intervenor and Appellant). | ) ) ) | Honorable Celia G. Gamrath, Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit's court discovery order directing Gaming Laboratories International, LLC, to produce certain e-mails where the communications were not protected by the attorney-client privilege. However, because we find Gaming Laboratories International, LLC, challenged the discovery order on a good-faith

basis with sound legal arguments, we vacate the court's friendly civil contempt order that assessed a monetary penalty.

¶ 2     This appeal comes to us pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016) from Gaming Laboratories International, LLC (GLI), appealing the circuit court's order finding it in civil contempt for refusing to comply with a discovery order to produce certain e-mails that it had withheld as privileged attorney-client communications. Because we agree with the circuit court that the e-mails were not protected by the attorney-client privilege, we affirm the court's discovery order. But because GLI challenged the discovery order on a good-faith basis with sound legal arguments, we vacate the court's civil contempt order.

¶ 3                              I. BACKGROUND

¶ 4                     A. Independent Testing Laboratories

¶ 5     Under the Video Gaming Act (Gaming Act), every gaming machine in Illinois is required to be certified as conforming to certain technical requirements before that machine is offered for play. 230 ILCS 40/15 (West 2018). The same is true for gaming machines under the Riverboat Gambling Act (Gambling Act).[1] 230 ILCS 10/5 (2018); 86 Ill. Adm. Code 3000.270 (2003). In July 2009, when the Gaming Act became effective, and through July 2013, the law provided that the Illinois Gaming Board (Board), the agency in charge of regulating gambling in Illinois, "may utilize the services of an independent outside testing laboratory" to perform the required certification. 230 ILCS 40/15 (West 2008); 230 ILCS 40/15 (West 2012). Similarly, in that time period, the Gambling Act's regulations provided that the administrator of the Board "may employ the services of an independent certification laboratory to evaluate the [gaming] device." 86 Ill.

---

[1] The Riverboat Gambling Act has since been renamed the Illinois Gambling Act. See Pub. Act 101-31, § 35-55 (eff. June 28, 2019) (amending 230 ILCS 10/1).

Adm. Code 3000.270 (2003). In other words, both laws allowed the Board to utilize the services of an independent certification company or instead certify the machines itself. Instead of doing the certification itself, the Board relied on an independent testing laboratory with which the State has contracted. Because of the required certification, video gaming manufacturers had to utilize the services of the approved laboratory before their products could be offered for play.

¶ 6        However, in August 2013, the legislature amended the Gaming Act and provided that the Board "may utilize the services of *one or more* independent outside testing laboratories that have been accredited by a national accreditation body and that, in the judgment of the Board, are qualified to perform" the required certification of gaming machines. (Emphasis added.) See Pub. Act 98-582, § 10 (eff. Aug. 27, 2013) (amending 230 ILCS 40/15). Public Act 98-582 also amended the Gambling Act, which thereafter provided that, in order to test "all mechanical, electromechanical, or electronic table games, slot machines, slot accounting systems, and other electronic gaming equipment, *** the Board may utilize the services of *one or more* independent outside testing laboratories that have been accredited by a national accreditation body and that, in the judgment of the Board, are qualified to perform such examinations." (Emphasis added.) See Pub. Act 98-582, § 3 (eff. Aug. 27, 2013) (adding 230 ILCS 10/5(a)(7.5)).

¶ 7        As a result of Public Act 98-582, from August 2013 until June 2019, the Gaming Act and Gambling Act allowed, but did not require, the Board to approve multiple testing laboratories to certify gaming machines and equipment. Despite this legislative allowance, the Board had only contracted with one testing laboratory: GLI, who had been working with the State in some capacity for approximately 25 years. The effect of the Board's contract with only one testing laboratory was that all gaming manufacturers operating in Illinois had to utilize the services of GLI. BMM North America, Inc. d/b/a BMM Testlabs (BMM) is also a company that provides independent

testing services to gaming manufacturers throughout the world. Although BMM conducted its business globally, Illinois was the only major gaming jurisdiction in North America that had not approved BMM as a testing laboratory.

¶ 8                                    B. Requests for Proposals

¶ 9     In July 2016, the most recent contracts GLI had signed with the Board to be its sole testing laboratory under the Gaming Act and Gambling Act were nearing the end of their terms. As such, the Board was preparing to issue requests for proposals (RFPs) to award testing contracts under both laws. On July 20, 2016, the Board held an open meeting, where representatives of BMM and GLI presented about their testing capabilities. In BMM's presentation, it focused heavily on explaining why Illinois needed to move away from single-source certification. Meanwhile, GLI focused on its relationship with the Board and noted that, merely because Illinois could utilize multiple laboratories, this did not mean improvements in the gaming environment would necessarily follow. In concluding the meeting, Don Tracy, the chairman of the Board, invited both parties to submit additional written information.

¶ 10    Following the open meeting, one member of the Board, Thomas Dunn, expressed concern to Tracy that staff from the Board were already leaning toward single-source certification.[2] In early August 2016, Ed Winkofsky and Martha Sabol, attorneys at the law firm Greenberg Traurig and registered lobbyists for GLI, were working with Eric Buske, a new associate general counsel in the Illinois Governor's office and Mark Ostrowski, the Board's administrator, on scheduling a time for GLI to have an educational meeting with the Governor's office, staff from the Board and

---

[2] The recitation of events that occurred after the open meeting comes from e-mails produced during discovery and depositions about those e-mails. These events would later form the central allegations of BMM's operative second amended complaint.

possibly even members of the Board. According to Ostrowski's deposition, BMM had been in communication with the Governor's office and members of the Board over the past months and GLI wanted the same opportunity.

¶ 11    By mid-August, staff from the Board had written draft RFPs to award the testing contracts. Around this time, Ostrowski and Tracy were in communication about GLI's proposed educational session with members of the Board. Tracy was concerned with the legality of such a meeting and skeptical that GLI wanted the meeting solely for educational purposes. Tracy brought his concerns to Dunn, who did not like the optics of the meeting and noted "[t]his whole thing is being driven by those who don't want two entities." Dunn added that this aversion to multiple testing laboratories "kind of makes you ask why" given that the costs for certification are borne by the gaming manufacturers not taxpayers. Tracy relayed his concerns about the meeting to Ostrowski and posited that the meeting might violate "the prohibition against Board member *ex parte* meetings on pending issues." In Tracy's deposition, he stated it seemed "obvious" that a meeting with Board members would be "related to the RFPs," though he admitted not knowing exactly why GLI had requested the meeting.

¶ 12    After Tracy raised concerns, Ostrowski discussed the possible meeting with Agostino Lorenzini, the Board's general counsel, and James Pellum, the Board's deputy general counsel. All three agreed that there was no issue with the meeting because GLI was the Board's current testing laboratory and the RFPs had not been issued yet. Lorenzini, in fact, noted in one e-mail that the Illinois Procurement Code (Procurement Code) (30 ILCS 500/1-1 *et seq.* (West 2018)) did not bar such a meeting if a report was made to the procurement policy board. Afterward, Ostrowski e-mailed Tracy and attempted to quell his concerns about the legality of the meeting.

¶ 13    Ultimately, on August 23, 2016, a meeting occurred and in attendance were: Buske from the Governor's office; Lorenzini, Pellum, Ostrowski and Robert Burke, the licensing coordinator, from the Board; Chad Kornett and Rich LaBrocca, GLI's director of technical compliance and senior director of engineering, respectively; and Winkofsky, Sabol, Emily Mattison and Adam Braun, all attorneys at the law firm Greenberg Traurig on behalf of GLI. No members of the Board attended the meeting, and no staff members from the Board who would ultimately score the bids to the RFPs attended.

¶ 14    In depositions, Ostrowski and Lorenzini both believed the meeting lasted a mere 10 minutes, though Pellum believed it lasted approximately an hour. Each staff member from the Board who gave a deposition could not recall any specifics of the meeting, except that generally GLI discussed the purpose of a testing laboratory. However, all staff members denied that the RFPs were discussed, with many positing that, had such a topic been discussed, they would have remembered the discussion. No one from the Board remembered reporting the meeting to the procurement office. According to the various deposition testimony, the August 23 meeting was the only one that occurred during August 2016 involving anyone from the Board. During Ostrowski's deposition, he acknowledged reviewing prior to his deposition an e-mail from Winkofsky containing a "draft outline" for a "possible August 31st meeting with Board members and staff." In that e-mail, Winkofsky suggested that GLI's representatives would discuss its "specific testing processes," a "[s]ummary of assistance provided in the development of the [video gaming terminal] program, including the RFP for central communication system, implementation of the [video gaming terminal] central system, and ongoing testing, certification, and implementation of the G2S protocol for the central system" and "[c]ompare cost of testing in Illinois to jurisdictions with multiple labs." However, beyond Ostrowski's review for his

deposition, he could not independently recall the e-mail, and no meeting occurred between GLI and members of the Board.

¶ 15    On September 27, 2016, the Board issued two RFPs to award contracts under the testing provisions of the Gaming Act and Gambling Act. Both RFPs indicated that the Board may issue one three-year contract or multiple three-year contracts with laboratories. Each RFP included a ranking system that awarded points based on different factors, including a laboratory's experience and qualifications in the gaming industry, its understanding of the testing required, and its financial stability. According to the RFPs, a score of 900 was required to even be considered for the contracts. BMM, GLI and a third company submitted proposals.

¶ 16    On January 17, 2017, Pellum sent memorandums to members of the Board regarding the RFPs, asserting that only BMM and GLI were substantively considered as the third company was unable to comply with the Procurement Code's registration requirements. Pellum stated that, based on an evaluation of GLI and BMM, only GLI had scored above 900 points. Pellum added that he submitted this information to the procurement office, who was notified that "this item has been included in the January 25, 2017 Closed Session Board Meeting Agenda and the announcement of the Award will become public at the January 26, 2017 Open Session Board Meeting." On January 20, 2017, the Board posted a notice for both RFPs, indicating its intent to award both contracts to GLI, pending the full approval of the Board, which came the following week.

¶ 17                              C. The Early Stages of Litigation

¶ 18    In February 2017, after unsuccessfully bidding for the contracts and believing that improprieties occurred in the procurement process, BMM filed a formal protest with the State's chief procurement officer. Later in the month, BMM also filed a complaint against the Board raising multiple counts, including one for administrative review, alleging that the Board's decision

to award the contracts to GLI was improper based on the Board exhibiting unfair favoritism toward GLI throughout the procurement process. BMM also filed a motion for a temporary restraining order to enjoin the Board from executing the contracts with GLI. The circuit court granted the motion and eventually enjoined the execution of the contracts until further order of the court. Over the next year, the parties filed various motions, and the circuit court allowed GLI to intervene in the lawsuit. The Board also filed the administrative record.

¶ 19     In February 2018, BMM filed a motion to amend the administrative record and for discovery sanctions, asserting that, nearly a year into the litigation and right before it was to take a corporate representative deposition of GLI under Supreme Court Rule 206(a)(1) (eff. Oct. 1, 2019), the Board "produced documents" related to the August 23, 2016, meeting that had been "previously undisclosed." These documents included the various e-mails sent to and from staff and members of the Board discussed earlier. BMM alleged that the meeting was for purposes of discussing the RFPs that were the subject of the instant litigation and the attendees from the Board "controlled every aspect of the bidding process," including "drafting the RFPs," "grading the responsive bids" and "awarding the contract[s] to GLI." In light of the meeting, BMM requested that the circuit court disqualify GLI as a bidder, amend the administrative record to reflect the occurrence of the meeting and allow discovery on the meeting.

¶ 20     In the Board's response, its attorney stated that he had only learned of the August 23, 2016, meeting right before BMM was scheduled to take the corporate representative deposition of GLI. Once he learned of the meeting, he contacted the Board to ask for all documents related to the meeting and immediately produced them once received. As to the substance of BMM's motion, the Board argued that the meeting was lawful because GLI only wanted to educate Buske, of the Governor's office, about GLI's services. According to the Board, at no time during the meeting

did anyone discuss the RFPs, no members attended the meeting and no one from GLI assisted in reviewing, drafting or preparing the RFPs. The Board supported these assertions with an affidavit from Burke, its licensing coordinator. Furthermore, the Board acknowledged the e-mail from Winkofsky to Ostrowski about a possible August 31st meeting, but asserted the agenda concerned a different meeting proposed by Winkofsky that never occurred. The Board contended that the administrative record did not need to be amended and sanctions were unwarranted.

¶ 21    In May 2018, the circuit court granted BMM's motion to amend the administrative record, finding that the e-mails produced by the Board were newly discovered evidence relevant to the BMM's claims about favoritism in the procurement process. The court asserted that the Board's members must be aware of this information "so that they can put it in context when they're evaluating these proposals." The court ordered expedited discovery on the meeting and the parties to confer and submit a proposed remand order to the Board for reconsideration of the awards.

¶ 22    On July 3, 2018, in connection with the circuit court's order for expedited discovery, GLI produced a privilege log that contained 19 e-mails and 1 attachment being privileged as attorney-client communications. Only 14 of those communications (13 e-mails and the 1 attachment) pertained to the August 23, 2016, meeting. Included in these e-mails from GLI were: Kornett, GLI's director of technical compliance; LaBrocca, GLI's senior director of engineering; Kevin Mullally, GLI's vice president of government relations and general counsel; James Maida, GLI's president; and Christine Gallo, GLI's vice president of quality assurance. Included in these e-mails from Greenberg Traurig, who represented GLI, were: Sabol, Winkofsky and Braun, all three attorneys and registered lobbyists, as well as Mattison, an attorney but not a registered lobbyist.

¶ 23    One category of communications included three e-mails and one attachment sent among Kornett, LaBrocca and Mullally in mid-August 2016.[3] A second category included two early August 2016 e-mails sent between Sabol and Mullally, which also had copied Kornett, LaBrocca, Winkofsky, Braun, Mattison, Maida and Gallo. A third category included one e-mail sent among Sabol, Winkofsky and Mullally in mid-August 2016. A fourth category included seven e-mails sent among Sabol, Winkofsky, Braun, Mattison, Mullally and Maida in late July and early August 2016. In one of those e-mails, Amber Davis, a paralegal and assistant of Winkofsky, was blindcopied. In the privilege log, GLI contended that the e-mails, including the attachment, were privileged as attorney-client communications because they contained discussions about legal strategy and advice related to the August 23, 2016, educational session with the Governor's office and a potential August 31, 2016, educational session with the Board.

¶ 24    Later in July 2018, the circuit court entered a remand order requiring the Board to reconsider its award of the two contracts to GLI based on the newly discovered evidence related to the August 23, 2016, meeting. This evidence included not only the various e-mail communications but also related depositions. The court also ordered the Board to consider making an adverse inference that the procurement process was "tainted" by its staff's alleged bias.

¶ 25    Meanwhile, after the prior testing contracts with GLI expired, the Board extended them because the circuit court's temporary restraining order prevented the Board from executing the new contracts with GLI. Eventually, the procurement office informed the Board that it could not extend the contracts anymore, so the Board executed emergency contracts with GLI. In September 2018, on remand from the circuit court, the Board voted unanimously to affirm its prior decision

---

[3] The categories of e-mails are derived from a motion filed by BMM for the circuit court to conduct an *in camera* inspection of the 14 allegedly privileged communications, which is discussed later.

to award both contracts to GLI. The Board found its staff did not commit any misconduct and that the August 23, 2016, meeting did not taint the decision to award the contracts to GLI. Nevertheless, the Board indicated that it intended to issue new RFPs to award contracts for testing services.

¶ 26                          D. The Second Amended Complaint

¶ 27    On October 5, 2018, a few months after filing an amended complaint, BMM filed the operative three-count second amended complaint, which again centered on the alleged unfairness in the procurement process that led to the Board awarding GLI the contract. In particular, BMM focused on the meeting of August 23, 2016 that occurred while the RFPs were in the process of being drafted. BMM also claimed that the agenda e-mailed to Ostrowski by Winkofsky about a possible August 31, 2016, meeting strongly resembled the final criteria listed on the RFPs. Additionally, BMM raised many allegations of impropriety regarding the scoring of the RFP bids. In Count I, BMM sought administrative review of the Board's decision to award both contracts to GLI. Specifically, BMM requested the circuit court to reverse and vacate the Board's original decisions from January 2017, reverse and vacate the Board's affirmance on remand, and permanently enjoin the execution of the contracts between the Board and GLI.

¶ 28    In Count II, BMM divided its allegations into two parts, one alleging violations of the Gaming Act (230 ILCS 40/1 *et seq.* (West 2018)) and Gambling Act (230 ILCS 10/1 *et seq.* (West 2018)), and the other alleging violations of the Procurement Code (30 ILCS 500/1-1 *et seq.* (West 2018)) and Administrative Code (2 Ill. Adm. Code 1620.825 (2018)). Regarding the Gaming Act and the Gambling Act, BMM sought declaratory judgments that the Board had a statutorily mandated responsibility to use its judgment to determine whether a bidding testing laboratory was qualified and that it failed to do so, thus rendering the contract awards null and void. BMM also sought to preliminarily and permanently enjoin the Board from awarding the contracts to GLI.

¶ 29 Regarding the Procurement Code and Administrative Code, BMM sought declaratory judgments that it was denied a fair bidding opportunity in various manners, that the Board must report *ex parte* communications like what occurred in the August 23, 2016, meeting pursuant to multiple provisions of the Procurement Code and Administrative Code during the forthcoming procurement process, and that GLI be declared a prohibited bidder in the forthcoming procurement process. As relief, in addition to the declarations, BMM sought injunctive relief, including permanently enjoining the Board from awarding the contracts to GLI. Finally, in Count III, BMM sought a declaratory judgment that the Board violated the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2018)) when it allegedly decided to award the contracts during a closed meeting.

¶ 30 Also on October 5, 2018, BMM filed a motion for the circuit court to conduct an *in camera* inspection of the allegedly 14 privileged documents to determine whether they were, in fact, privileged. BMM noted GLI's position throughout the litigation that the August 23, 2016, meeting was to educate the Governor's office, but argued if that were the case, the communications would therefore not contain legal advice. BMM contended that GLI had failed to offer any explanation as to what legal advice or strategy could be necessary for a purely educational meeting with the Governor's office that staff from the Board attended. BMM posited that, because GLI's attorneys possessed dual roles as legal counsel and lobbyists, and Mullally's dual role as general counsel and vice president of government relations, the only way to determine whether the communications pertained to business or legal advice was an *in camera* inspection by the court.

¶ 31 Shortly thereafter, the Board issued two new RFPs for the testing contracts, which superseded the RFPs at issue in the instant litigation. On October 23, 2018, the Illinois chief procurement officer cancelled the new RFPs because they failed to provide for awards to multiple bidders in a manner that complied with the Procurement Code.

¶ 32    In November 2018, GLI responded to BMM's motion for an *in camera* inspection and argued the motion should be denied in pertinent part because BMM had failed to meet the threshold evidentiary showing for an *in camera* review and even if BMM did, additional factors weighed against such a review. GLI contended that its privilege log as well as attached affidavits from Mullally, Winkofsky and Sabol showed that the e-mails were made in connection with, and for the purpose of, formulating legal strategy and rendering legal advice about the ramifications of holding an educational session with the Board and the Governor's office.

¶ 33    In Mullally's affidavit, he averred that he was responsible for managing GLI's outside counsel and was the one ultimately responsible for the company's legal decisions and strategies. Mullally asserted that LaBrocca and Kornett were part of "GLI's senior management team in connection" with the bid on the testing contracts and that GLI's primary outside counsel for its operations in Illinois were Sabol and Winkofsky, though he occasionally sought and obtained legal advice from Mattison and Braun. Mullally averred that when he learned BMM was communicating with the Governor's office, Board staff and Board members directly, he wanted to have a meeting with the Board and the Governor's office to "educate them on GLI's contractual roles and responsibilities, as well as the operations of independent test labs in general." To this end, Mullally stated that, in his role as general counsel, he consulted with GLI senior management as well as Winkofsky, Sabol, Braun and Mattison "for the purpose of formulating and administering legal advice and strategy regarding the legal ramifications, if any, of the propriety, substance, and timing, among other issues, of an educational session at which members of GLI's management team would provide information about the products and services of independent test labs to the [Board] and/or the Governor's Office." Mullally accordingly asserted that all of the e-mails in the privilege log that he was included on concerned legal advice and strategy.

¶ 34    In Winkofsky and Sabol's affidavits, they averred to similar statements as Mullally. They added that, as part of ongoing dialogue related to a possible educational session between GLI, the Board and the Governor's office, GLI senior management asked them "to identify legal issues and make recommendations to ensure that nothing in the correspondence or the discussions resulted in a breach of the existing GLI engagement with the [Board] or implicated and/or violated [the Gaming Act, the Gambling Act] or the policies of the [Board]." Winkofsky and Sabol conceded that they were registered lobbyists, but asserted this was because they appeared regularly before the Board at public meetings to advocate on behalf of various clients. Both, however, averred that none of the services rendered in connection with GLI's potential educational session were performed in their capacity as lobbyists.

¶ 35    On November 26, 2018, the circuit court held a hearing on BMM's motion for *in camera* inspection. Initially, GLI revealed that 2 of the 14 allegedly privileged communications had already been produced and were accidentally included in the privilege log, leaving only 12 communications at issue. The two already produced e-mails were so-called category one e-mails or discussions between Mullally, Kornett and LaBrocca. During the hearing, the court remarked that the "predominant purpose of the communication[s]" should guide the determination of whether they were privileged, and this purpose could only be ascertained by reviewing them *in camera*. The court observed that, because Mullally was GLI's vice president of government relations and general counsel, his "combined role inherently presents" a question of whether he was communicating in a business capacity or legal capacity. The court also noted the dual role of GLI's attorneys who acted as lobbyists. Although the court acknowledged Mullally, Winkofsky and Sabol's unrebutted affidavits, wherein they averred they were acting in legal roles during such communications, it asserted that such statements were conclusory and their own self-assessments

did not preclude an *in camera* inspection nor a contrary finding. The court observed that the privilege log's descriptions about the communications were vague and remarked that "courts have found that when a lawyer gives business advice, negotiation advice, that is different from legal advice." Given the vague privilege log and the dual roles of the relevant people in the e-mails, the court concluded it could not determine what role people were acting in during the various communications. The court accordingly granted BMM's motion to conduct an *in camera* inspection of the communications and ordered GLI to tender them. However, the trial judge reserved ruling on whether she would conduct the *in camera* inspection or another trial judge.

¶ 36     GLI tendered the required communications and sought leave to file evidence in support of its privilege claims to show how the specific communications at issue came to be. To support its motion for leave, GLI included offers of proof from Mullally, Kornett, Sabol and Winkofsky.

¶ 37     In January 2019, at a hearing on GLI's motion for leave, the circuit court initially noted that it had not yet reviewed the communications or passed them along to another trial judge. GLI informed the court it wanted to submit additional affidavits to provide the circumstances surrounding the e-mails, including contemporaneous oral discussions, and why they were privileged attorney-client communications. Ultimately, the court denied GLI the opportunity to present additional affidavits and allowed the offers of proof contained in the motion for leave to stand as the additional evidence. The court also heard additional argument from the parties on the issue of who should perform the *in camera* inspection. Later that month, the Board issued new RFPs to select one or multiple independent testing laboratories.

¶ 38     On March 12, 2019, the circuit court entered a written order on GLI's privilege claims. First, the trial judge remarked that she conducted the *in camera* review because the context surrounding the e-mails was "critical" to the resolution of the privilege claims and she was

"intimately familiar" with the case. Regarding the substance of the e-mails, the court initially found that Kornett and LaBrocca were members of GLI's control group given the affidavits presented. Next, the court observed that the attorney-client privilege only attached to communications where legal advice, not business advice, was sought. The court noted that GLI, as the proponent of the privilege claims, had the burden to show the e-mails were privileged. The court highlighted that its review was complicated by many of the relevant parties having dual roles. Because of this complication, the court asserted that it "look[ed] to the predominant purpose" of the e-mails. Ultimately, the court found that the communications did not contain discussions of legal strategies or advice and thus, GLI had not met its burden to show the communications were protected by the attorney-client privilege. It accordingly ordered GLI to produce the 12 communications to BMM.

¶ 39 GLI subsequently indicated that it would not comply with the discovery order and moved the circuit court to find it in "friendly" civil contempt in order to facilitate appellate review of the privilege issue. The court found GLI in contempt and imposed a sanction of $50 per day, but stayed the payment. BMM also moved for sanctions against GLI for its failure to produce the communications, but the court stayed resolution of the motion until GLI's appeal was resolved.

¶ 40 Meanwhile, the parties were filing various dispositive motions toward BMM's second amended complaint. The Board filed a motion to dismiss Counts I and II of BMM's second amended complaint based on mootness grounds given the issuance of new RFPs. The Board attached an affidavit from Lorenzini, its general counsel and at the time its acting administrator, who averred that the chief procurement officer had barred the Board from executing the original two contracts awarded to GLI and as such, the Board could not execute them. Because of this, the Board posited that an intervening event precluded the circuit court from providing BMM with effectual relief. GLI also filed a motion to dismiss Counts I and II of BMM's second amended

complaint based on mootness grounds. In addition, GLI argued that Count II should be dismissed because BMM lacked standing to prosecute the alleged statutory violations, it failed to exhaust its administrative remedies and there was no justiciable controversy warranting declaratory relief.

¶ 41 On April 19, 2019, the circuit court dismissed Count I of BMM's second amended complaint, finding the count for administrative review to be moot given that the original contracts awarded pursuant to the original RFPs had been cancelled and new RFPs had been issued. The court, however, denied GLI and the Board's motions to dismiss on Count II, finding that, to the extent BMM challenged the propriety of the interactions between the Board and GLI during the procurement process, the overall fairness of the RFPs and the legality of the bidding process, there was a ripe controversy for declaratory relief. In other words, because Count II "hone[d] in on the legality of the Board conduct and fairness of the process," not merely the correctness of the Board's decisions, there was still "an ongoing actual controversy appropriate for declaratory relief." Moreover, the court found that, even if Count II were entirely moot, it would have applied the public interest exception to the mootness doctrine given the need for clarification in the future regarding the Board holding private meetings with bidders during the procurement process.

¶ 42 Additionally, on the Board and BMM's cross-motions for summary judgment on Count III, the circuit court found that the Board had violated the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2018)). The court accordingly granted BMM's motion for summary judgment and denied the Board's motion. The court ordered the Board to comply with the Open Meetings Act in all future meetings and awarded BMM attorney fees and costs for prevailing.

¶ 43 Following the circuit court's civil contempt order, GLI timely appealed pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016).

¶ 44                                    II. ANALYSIS

¶ 45                    A. Recent Statutory Amendments

¶ 46    Before addressing GLI's arguments on appeal, we must discuss what has occurred legislatively since the initiation of this appeal, as highlighted by GLI in its brief.[4] As previously mentioned, from August 2013 until June 2019, the Gaming Act and Gambling Act allowed, but did not require, the Board to utilize multiple testing laboratories for the required certification of gaming machines. See 230 ILCS 10/5(a)(7.5) (West 2018); 230 ILCS 40/15 (West 2018). However, on June 28, 2019, our legislature enacted Public Act 101-31, which significantly altered provisions of the Gaming Act and the Gambling Act.

¶ 47    Relevant to this appeal, Public Act 101-31 amended section 15 of the Gaming Act, which now provides that, for the required certification of gaming machines, "the Board *shall* utilize the services of independent outside testing laboratories that have been accredited in accordance with ISO/IEC 17025 by an accreditation body that is a signatory to the International Laboratory Accreditation Cooperation Mutual Recognition Agreement signifying they are qualified to perform such examinations." (Emphasis added.) Pub. Act 101-31, § 35-60 (eff. June 28, 2019) (amending 230 ILCS 40/15). The amended section 15 further provides that "[t]he Board shall not withhold its approval of an independent outside testing laboratory license applicant that has been accredited as required by this Section and is licensed in gaming jurisdictions comparable to Illinois" and "[u]pon the finalization of required rules, the Board shall license independent testing laboratories and accept the test reports of any licensed testing laboratory of the video gaming machine's or associated equipment manufacturer's choice, notwithstanding the existence of contracts between the Board and any independent testing laboratory." *Id.*

_____

[4] The Board has not filed a brief in this appeal.

¶ 48 Similarly, Public Act 101-31 amended section 5(a)(7.5) of the Gambling Act, which now provides that, for the required certification of gaming machines, "the Board *shall* utilize the services of independent outside testing laboratories that have been accredited in accordance with ISO/IEC 17025 by an accreditation body that is a signatory to the International Laboratory Accreditation Cooperation Mutual Recognition Agreement signifying they are qualified to perform such examinations." (Emphasis added.) Pub. Act 101-31, § 35-55 (eff. June 28, 2019) (amending 230 ILCS 10/5(a)(7.5)). The amended section 5(a)(7.5) further provides that "[t]he Board shall not withhold its approval of an independent outside testing laboratory license applicant that has been accredited as required under this paragraph (7.5) and is licensed in gaming jurisdictions comparable to Illinois" and "[u]pon the finalization of required rules, the Board shall license independent testing laboratories and accept the test reports of any licensed testing laboratory of the system's, game's, or machine manufacturer's choice, notwithstanding the existence of contracts between the Board and any independent testing laboratory." *Id.*

¶ 49 In other words, Public Act 101-31 removed the Board's discretion to select one or more testing laboratories and replaced that discretion with an external approval process whereby licensing is based on outside accreditation and licensure in a gaming jurisdiction comparable to Illinois. The Board has acknowledged this reality. In a notice of proposed amendments and a notice of emergency amendments to the Administrative Code for rules related to the Gaming Act, the Board stated that Public Act 101-31 "change[d] how the [Board] obtains independent testing laboratory services" as before the public act "the [Board] was required to contract with one or more testing laboratories through the State's procurement process." 43 Ill. Reg. 9312 (proposed Sept. 6, 2019); 43 Ill. Reg. 9788 (emergency rule eff. Aug. 19, 2019). But now with Public Act 101-31, according to the notices, the Board " 'shall license independent testing laboratories and

accept the test reports of any independent testing laboratory of the video gaming machine's or associated equipment manufacturer's choice, notwithstanding the existence of contracts between the Board and any independent testing laboratory.' " 43 Ill. Reg. 9312 (proposed Sept. 6, 2019) (quoting 230 ILCS 40/15); 43 Ill. Reg. 9788 (emergency rule eff. Aug. 19, 2019) (quoting 230 ILCS 40/15).

¶ 50    A similar notice of proposed amendments and a similar notice of emergency amendments to the Administrative Code for rules related to the Gambling Act were issued, acknowledging the effect of Public Act 101-31 on the "the way the Board obtains independent testing lab services" and the now unnecessary "procurement process." 43 Ill. Reg. 9315 (proposed Sept. 6, 2019); 43 Ill. Reg. 9801 (emergency rule eff. Aug. 23, 2019). But now due to Public Act 101-31, according to the notices, "any independent outside testing laboratory that holds an accreditation in accordance with ISO/IEC 17025 by an accreditation body that is a signatory to the International Laboratory Accreditation Cooperation Mutual Recognition Agreement, and is authorized to perform independent testing laboratory services in a gaming jurisdiction similar to Illinois, is licensed to perform independent testing laboratory services in Illinois." *Id.*

¶ 51    Nevertheless, BMM posits that GLI improperly included documents in its brief that were not part of the record on appeal and argues we should strike the documents and related arguments. It appears that BMM is referring to GLI's inclusion of the amendments to the Gaming Act and Gambling Act as well as related regulatory notices from the Board. We will not grant BMM's requests, as reviewing courts always have the authority to consider legislative amendments subsequent to the initiation of an appeal (see *Bartlow v. Costigan*, 2014 IL 115152, ¶¶ 27-31 *People v. Johnson*, 225 Ill. 2d 573, 580 (2007)), and we may take judicial notice of any

administrative rules or regulations "even when they are not part of the record on appeal." *G.I.S. Venture v. Novak*, 388 Ill. App. 3d 184, 187 (2009).

¶ 52                                    B. Appellate Jurisdiction

¶ 53    Given these amendments, GLI contends that BMM's remaining claims for declaratory relief in Count II are moot, and in turn, the circuit court's discovery order and its civil contempt finding should be vacated as moot. Initially, though, BMM posits that we lack jurisdiction to entertain GLI's mootness arguments because GLI appealed pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016).

¶ 54    Rule 304(b)(5) allows an appeal from a circuit court "order finding a person or entity in contempt of court which imposes a monetary or other penalty." *Id.* Based on the language of Rule 304(b)(5), "the only order that is subject to review is the *order* finding [an entity] in contempt." (Emphasis in original.) *In re Marriage of Nettleton*, 348 Ill. App. 3d 961, 968 (2004). However, where a party appeals a contempt order based on a discovery violation, the underlying discovery order also becomes subject to appellate review (*Harris v. One Hope United, Inc.*, 2015 IL 117200, ¶ 6), as the review of a contempt finding necessitates review of the order on which it was based. *In re Marriage of Nettleton*, 348 Ill. App. 3d at 968. In other words, "[i]n an appeal from an order of civil contempt, we are confined to review only those matters relevant to the order and not matters outside of it." *Jiotis v. Burr Ridge Park District*, 2014 IL App (2d) 121293, ¶ 53. Thus, generally, where a party challenges an issue on appeal not permitted by Rule 304(b), we lack jurisdiction to entertain such a challenge. *In re Marriage of Arjmand*, 2017 IL App (2d) 160631, ¶ 30.

¶ 55    BMM also asserts that if we were to address GLI's mootness argument, we would be reversing the circuit court's April 19, 2019, order in which it found Count II presented a live controversy insofar as BMM challenged the propriety of the interactions between the Board and

GLI during the procurement process, the overall fairness of the RFPs and the legality of the bidding process. To this end, BMM argues that the April 19, 2019, order is not part of this appeal because the denial of a motion to dismiss is not a final and appealable order, the order was not identified in GLI's notice of appeal, and the order was not a step in the procedural progression leading to GLI being found in contempt. See *CitiMortgage, Inc. v. Hoeft*, 2015 IL App (1st) 150459, ¶ 8 ("[T]he denial of a motion to dismiss is not a final and appealable order."); *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 55 ("A notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal."); *U.S. Bank National Association v. Luckett*, 2013 IL App (1st) 113678, ¶ 13 (stating that orders not specified in a notice of appeal are reviewable only if the order was a step in the procedural progression leading to the judgment specified in the notice of appeal). Given the foregoing, BMM argues we have no jurisdiction to consider the effects of Public Act 101-31 on the entire lawsuit, including specifically whether Count II, the contempt finding and discovery order are moot.

¶ 56    Yet, as noted by GLI, "[a] case must remain a legal controversy from the time filed in the appellate court until the moment of disposition" (*Davis v. City of Country Club Hills*, 2013 IL App (1st) 123634, ¶ 10) and "[t]he existence of a real controversy is an essential prerequisite to appellate jurisdiction." *In re Estate of Wellman*, 174 Ill. 2d 335, 353 (1996). "A case on appeal is rendered moot where the issues that were presented in the trial court do not exist any longer because intervening events have rendered it impossible for the reviewing court to grant the complaining party effectual relief." *In re India B.*, 202 Ill. 2d 522, 542 (2002). Stated otherwise, "[m]ootness occurs once the plaintiff has secured what he basically sought and a resolution of the issues could not have any practical effect on the existing controversy." *Hanna v. City of Chicago*, 382 Ill. App. 3d 672, 677 (2008). This court has an independent duty to consider its jurisdiction.

*Nelson v. Brewer*, 2019 IL App (1st) 173143, ¶ 43. Because of this, and contrary to BMM's assertion otherwise, whether a case is moot may be decided by the appellate court without the issue ever being raised in the circuit court. See *Patel v. Illinois State Medical Society*, 298 Ill. App. 3d 356, 364, n.5 (1998) (concluding "it is not appropriate to apply waiver to a mootness argument, because mootness is at its core a lack of jurisdiction"). Moreover, a party's failure to raise a theory in the circuit court, which ordinarily would prevent that party from raising the theory on appeal (*id.*), does not apply "when the new issue arises because of a change in law after the trial court's decision." *In re Marriage of Bates*, 141 Ill. App. 3d 566, 569 (1986).

¶ 57    There is an obvious tension between GLI and BMM's appellate jurisdiction arguments. On the one hand, Rule 304(b)(5) affords the appellate court the power to review only a contempt finding and underlying discovery order, thus providing this court limited jurisdiction in our review. On the other hand, if a case is rendered moot by an intervening event subsequent to the initiation of an appeal, we lack jurisdiction over the appeal. In the present case, despite the amendments to the Gaming Act and Gambling Act, we find a real controversy still exists over the discoverability of the e-mails that prevents the entire case from being rendered moot given that access to the e-mails, if deemed not protected by the attorney-client privilege, could affect some of the allegations and prayers for relief contained in Count II—the only count remaining in BMM's second amended complaint. As such, despite the amendments to the Gaming Act and Gambling Act, the entire cause is not moot given the real controversy still in existence on the discoverability of the e-mails. We are therefore confined to review only the contempt finding and discovery order in this appeal. See *Jiotis*, 2014 IL App (2d) 121293, ¶ 53.

¶ 58    Nevertheless, in arguing that we may look beyond the propriety of the contempt finding and discovery order and consider the effect of the amendments to the Gaming Act and Gambling

Act on the entire lawsuit, GLI cites *Davis*, 2013 IL App (1st) 123634, where this court took an appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). Under Rule 307(a)(1), a party may appeal an order of the circuit court that grants, modifies, denies or dissolves an injunction. *Id.* Like Rule 304(b)(5), an appeal pursuant to Rule 307(a)(1) is "limited [in] scope." *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 399 (1993). "In such an appeal, the only question properly before the reviewing court is whether there was a sufficient showing made to the trial court to sustain its order" related to an injunction. *Id.* In *Davis*, although the case came to the appellate court pursuant to Rule 307(a)(1), the court addressed an issue beyond the propriety of the circuit court's injunctive relief where subsequent, intervening events may have mooted the entire case.

¶ 59    In the decision, voters in the City of Country Club Hills successfully petitioned to include a referendum on a ballot to reduce the number of aldermen from 10 to 5, and the referendum ultimately passed. *Id.* ¶¶ 4-5. Thereafter, several plaintiffs filed a lawsuit, alleging that the city clerk exceeded her statutory authority in putting the referendum on the ballot. *Id.* ¶ 6. In conjunction with their lawsuit, the plaintiffs filed a motion to preliminarily enjoin the results of the referendum, which the circuit court denied. *Id.* ¶¶ 6-7. The plaintiffs appealed under Rule 307(a)(1), though the appellate court did not specifically refer to the rule. *Id.* ¶ 8. By the time briefing was completed in the appellate court, the election of the five aldermen had already occurred and been certified. *Id.* On appeal, given the events occurring after the initiation of the appeal, the appellate court first addressed its own jurisdiction and ultimately concluded that it lacked jurisdiction because the entire cause had been rendered moot by the election and certification. *Id.* ¶¶ 10-15.

¶ 60    However, *Davis* is distinguishable. First, it involved an entirely different supreme court rule. And second, it is well-established in Illinois that "the conclusion of an election cycle normally moots an election contest." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 36. Thus, in *Davis*, the election and certification entirely extinguished the live controversy that existed in the circuit court. In the present case, because the discoverability of the e-mails presents a live controversy that has not been extinguished by the amendments to the Gaming Act and Gambling Act, we cannot find the entire cause moot at this juncture.

¶ 61                               C. Propriety of the *In Camera* Review

¶ 62    Because this case presents a live controversy regarding the discoverability of the e-mails, we must address the issue, beginning with the threshold question of whether the circuit court properly ordered an *in camera* review of the e-mails.

¶ 63    The circuit court has the authority to supervise any or all of the discovery process. Ill. S. Ct. R. 201(c)(2) (eff. July 1, 2014). Particular to this case, under Illinois Supreme Court Rule 201(n) (eff. July 1, 2014):

>    "When information or documents are withheld from disclosure or discovery on a
>
>    claim that they are privileged pursuant to a common law or statutory privilege, any
>
>    such claim shall be made expressly and shall be supported by a description of the
>
>    nature of the documents, communications or things not produced or disclosed and
>
>    the exact privilege which is being claimed."

Rule 201(n) allows the circuit "court to evaluate the applicability of the asserted privilege and determine the need for an *in camera* inspection of the documents, and to minimize disputes between the parties." *Custer v. Cerro Flow Products, Inc.*, 2019 IL App (5th) 190285, ¶ 28. See also *Thomas v. Page*, 361 Ill. App. 3d 484, 497 (2005) (same). The court "routinely" reviews

documents *in camera* "when a judicial decision concerns information claimed to be covered by some rule of confidentiality or privilege." *A.P. v. M.E.E.*, 354 Ill. App. 3d 989, 1002 (2004). Because the court has wide authority to oversee the discovery process, we review its decision to conduct an *in camera* review of allegedly privileged documents for an abuse of discretion. *Brown v. Advocate Health & Hospitals Corp.*, 2017 IL App (1st) 161918, ¶ 24. An abuse of discretion occurs only if the court's ruling was arbitrary or unreasonable to the degree that no reasonable person would adopt the same view. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 64    In the present case, the circuit court did not abuse its discretion in ordering the *in camera* review of the allegedly privileged e-mails. As noted by the court, in all of the e-mails, there was at least one, and often multiple individuals, who held dual roles, part legal and part lobbyist or business development. In the Category One e-mails, Mullally, GLI's vice president of government relations and general counsel, was included. In the Category Two e-mails, Mullally was included as well as Sabol, Winkofsky and Braun, who were attorneys as well as registered lobbyists. In the Category Three e-mail, Mullally, Sabol and Winkofsky were included. Lastly, in the Category Four e-mails, Sabol, Winkofsky, Braun and Mullally were included. Although Sabol, Winkofsky and Mullally all provided affidavits asserting that their involvement in the e-mail communications were legal in nature, the court aptly noted that their own self-assessments of their roles did not preclude an *in camera* inspection. See *Steiner Electric Co. v. NuLine Technologies, Inc.*, 364 Ill. App. 3d 876, 881 (2006) (stating legal conclusions and opinions set forth in affidavits do not need to be accepted as true).

¶ 65    The dual roles of the individuals involved necessarily complicated the circuit court's balance of the sacrosanct attorney-client privilege (see *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 30) against the critical need for the truth-seeking process. See *Waste*

*Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991) (stating Illinois has "a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit"). In balancing these competing interests, the court found the dual roles problematic in determining whether the e-mails were made in a legal context or a business context. And the court could not resolve this issue merely by reviewing GLI's privilege log or its affidavits and informal offers of proof in support of the privilege log. Given this unresolved question, the court's order to produce the e-mails for an *in camera* review was a reasonable effort to protect both the attorney-client privilege and the truth-seeking process, as it ensured that only truly attorney-client communications were protected from disclosure. Furthermore, while often a judge other than the judge presiding over the case should conduct the *in camera* review (see *People v. Radojcic*, 2013 IL 114197, ¶ 45; *In re Marriage of Decker*, 153 Ill. 2d 298, 325 (1992)), we do not find this case to be one of those instances given the detailed context needed to fully understand the issues and information discussed in the e-mails. The court's decision to perform the *in camera* review itself was not unreasonable given the circumstances of the case.

¶ 66    Still, GLI directs us to *In re Marriage of Decker*, 153 Ill. 2d 298, which it claims established a higher evidentiary threshold for the circuit court to conduct an *in camera* review. In *In re Marriage of Decker*, our supreme court addressed what evidentiary showing was necessary to trigger an *in camera* review of information to determine if the crime-fraud exception to the attorney-client privilege applied. *Id.* at 323-25. In answering this question, our supreme court adopted the approach set forth in *United States v. Zolin*, 491 U.S. 554 (1989) and concluded that the proponent of the crime-fraud exception must make "a showing of factual basis adequate to support a good faith belief by a reasonable person, [citation] that *in camera* review of the materials

may reveal evidence to establish the claim that the crime-fraud exception applies." (Internal quotation marks omitted.) *In re Marriage of Decker*, 153 Ill. 2d at 324-25. Once that threshold has been met, the court has discretion to conduct the *in camera* review and in exercising that discretion, may consider such factors as "the volume of materials it is asked to review, the relative importance of the information to the case, and the likelihood that *in camera* review of the material, along with other evidence, will support the crime-fraud exception." *Id.* at 324 (citing *Zolin*, 491 U.S. at 572). In adopting the approach of *Zolin*, our supreme court stated it was "a sensible solution to the problem of establishing the crime-fraud exception to the attorney-client privilege." *Id.* at 324-25.

¶ 67    In *In re Marriage of Decker*, there is no indication that our supreme court intended this approach and threshold to apply before any *in camera* review by the circuit court. Rather, it appears from *In re Marriage of Decker* as well as *Radojcic*, 2013 IL 114197, that this higher evidentiary threshold applies only when the crime-fraud exception to the attorney-client privilege is in question. See *Radojcic*, 2013 IL 114197, ¶ 45 (stating that, "[u]nder [the *Zolin* approach as adopted by *In re Marriage of Decker*], the trial court may conduct *in camera* review of the communications at issue to determine whether the crime-fraud exception applies"). Critically, the situation in *In re Marriage of Decker* is vastly different from the situation in this case. In *In re Marriage of Decker*, there was no challenge to whether the elements of the attorney-client privilege had been met. Rather, the issue was whether the crime-fraud exception to the privilege applied. Here, BMM argues that the elements of the attorney-client privilege, which will be discussed later, have not been satisfied. Notably, GLI cites no Illinois case applying *In re Marriage of Decker*'s approach to cases other than those involving the crime-fraud exception. While GLI does cite to several federal court and other state court decisions, they are merely persuasive authority. See *Wilson v. County of Cook*, 2012 IL 112026, ¶ 30, *Perik v. JPMorgan Chase Bank, N.A.*, 2015 IL App (1st)

132245, ¶ 25. And while GLI cites *Hitt v. Stephens*, 285 Ill. App. 3d 713, 717 (1997) and posits that the appellate court in that case "rejected [an] attempt to limit *Decker* to the crime-fraud context," *Hitt* did not involve an *in camera* review and has no bearing on the propriety of the *in camera* review in this case. Most importantly, however, because our supreme court has not given any indication that the *Zolin* approach was intended to apply to all cases involving *in camera* reviews of allegedly privileged information, we will not utilize the *Zolin* approach in this case.

¶ 68    GLI also argues that the circuit court applied the approach of *Zolin* as stated in *In re Marriage of Decker*, but did so incorrectly. Our review of the record, though, shows that the court only used *In re Marriage of Decker* as a guide for best practices, particularly in determining whether to conduct the *in camera* review itself or utilize another trial judge. Regardless, even if the court did apply *In re Marriage of Decker* and the higher evidentiary threshold for an *in camera* review was required, we still could not say that the court acted unreasonably in ordering the *in camera* review given the unique circumstances of this case. Consequently, the circuit court properly utilized its discretion to conduct an *in camera* review of the allegedly privileged e-mails.

¶ 69                    D. Applicability of the Attorney-Client Privilege

¶ 70    Having found the circuit court properly utilized its discretion to conduct an *in camera* review of the e-mails, we now turn to the issue of whether those e-mails are protected by the attorney-client privilege. GLI argues that the e-mails are privileged because they occurred in the context of an attorney-client relationship and involved communications made in a professional legal capacity. BMM, however, argues that the communications pertain to GLI's business efforts, not legal advice, and are therefore not protected by the attorney-client privilege.

¶ 71    "Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected from

disclosure by the client or lawyer, unless the protection is waived." *Center Partners*, 2012 IL 113107, ¶ 30. The attorney-client privilege is critical to the proper functioning of the judicial system because it promotes and encourages candid conversations between a lawyer and his client by eliminating the fear that the disclosure of those communications could be compelled. *Id.* ¶¶ 30-31. As previously noted, Illinois has "a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Waste Management*, 144 Ill. 2d at 190. As such, because the privilege bars discovery to "relevant and material facts it is an exception to the general duty to disclose and is interpreted narrowly." *Adler v. Greenfield*, 2013 IL App (1st) 121066, ¶ 41.

¶ 72    "The party claiming the attorney-client privilege has the burden to present factual evidence establishing the privilege." *Caldwell v. Advocate Condell Med. Center*, 2017 IL App (2d) 160456, ¶ 71. Though GLI relies on *In re Marriage of Decker* and posits that there is a rebuttable presumption the e-mails are privileged, we disagree. In *In re Marriage of Decker*, 153 Ill. 2d at 328-29, our supreme court observed that "when there is an attorney-client relationship in which an attorney and client have communicated in a professional capacity *** , there is a rebuttable presumption that their communication is privileged." But if "the opposing party challenges the presumption, then the proponent of the privilege must prove the existence of the essential elements giving rise to the privilege." *Id.* at 329. Here, BMM challenges the existence of the essential elements giving rise to the attorney-client privilege, namely arguing that the e-mails pertain to GLI's business efforts and were not made within the confines of an attorney-client relationship. As such, there is no presumption that the communications are privileged, and GLI has the burden to burden to present factual evidence establishing the privilege. While the resolution of discovery issues generally lies within the discretion of the circuit court, the court "lacks the discretion to

compel the disclosure of privileged information." *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 785 (2009). Thus, we review whether the e-mails are privileged *de novo*. *Adler*, 2013 IL App (1st) 121066, ¶ 40.

¶ 73                                                1. Category One Communications

¶ 74    The first category of communications included one e-mail and an attachment sent by Kornett to LaBrocca and Mullally on August 22, 2016. Initially, for purposes of this analysis, we will assume *arguendo* that the circuit court was correct in determining that Kornett and LaBrocca, GLI's director of technical compliance and senior director of engineering, respectively, were part of GLI's control group. See *Doe v. Township High School District 211*, 2015 IL App (1st) 140857, ¶¶ 103-105 (when the client in the attorney-client relationship is a corporation or similar organization, only employees of the corporation who are part of the "control group" will be afforded an attorney-client privilege when speaking for the corporation). With that assumption in mind, we note the e-mail contained nothing sensitive and merely directed LaBrocca and Mullally to the attachment, which contained essentially an outline for a presentation with the Governor's office the following day. In an introductory section of the outline, Kornett included brief remarks that explained why he was giving the presentation. In the substantive part of the outline, Kornett listed items he intended to cover, such as a history of GLI's involvement with the Board, its specific testing processes used in Illinois, and how it has reduced the time and costs involved in testing while also improving the quality. In neither the introductory remarks nor substantive outline of the presentation was there any discussion of legal strategy or request for legal advice. See *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 408-09 (1998) (finding the attorney-client privilege inapplicable because the documents at issue did not contain the seeking of legal advice). The attachment is nothing more than what Kornett intended to present to the

Governor's office the following day. Critically, there is nothing in the e-mail or the attachment where Kornett sought legal advice of any kind from Mullally in his capacity as GLI's general counsel. See *Center Partners*, 2012 IL 113107, ¶ 30 (observing that the attorney-client privilege only protects communications "[w]here legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer").

¶ 75    Furthermore, even if the information contained in the attachment could somehow be construed as being made within an attorney-client relationship, Kornett clearly intended to divulge the information to the attendees of the meeting the following day, including staff from the Board and Buske from the Governor's office. In other words, the information in the outline was not intended to be confidential. See *Illinois Education Ass'n v. Illinois State Board of Education*, 204 Ill. 2d 456, 467 (2003) (observing that for communications to be protected by the attorney-client privilege, the communication must be "made in confidence" by the client). Consequently, the circuit court properly found this e-mail and attachment not protected by the attorney-client privilege.

¶ 76                                2. Category Two Communications

¶ 77    The second category of communications included two e-mails sent between primarily Sabol and Mullally on August 5, 2016, though copied on both e-mails were Braun, Winkofsky, Mattison, LaBrocca, Kornett, Maida and Gallo. Although Mullally's e-mail contained information related to a potential meeting with the Governor's office, the e-mail focused almost entirely on his desire to have LaBrocca and Kornett make a presentation to members of the Board. To this end, Mullally included in the e-mail an outline of such a presentation with the topics he wanted LaBrocca and Kornett to discuss assuming Tracy, the chairman of the Board, agreed to such a meeting. Critically, nowhere in Mullally's e-mail did he seek legal advice or ask for comments on

legal strategy from Sabol, Braun, Winkofsky or Mattison—GLI's outside counsel—in their capacities as attorneys. See *Center Partners*, 2012 IL 113107, ¶ 30; *Chicago Trust*, 298 Ill. App. 3d at 408-09. Lastly, in Sabol's e-mail, she merely responded to Mullally's e-mail, acknowledging it and remarking that she and Winkofsky would work on implementing the plan with "Mark," presumably Ostrowski, the Board's administrator. There is nothing of a legal nature in Sabol's response. Consequently, the circuit court properly found these e-mails not protected by the attorney-client privilege.

¶ 78                                  3. Category Three Communication

¶ 79    The third category of communications included one e-mail sent by Winkofsky to Mullally and Sabol on August 11, 2016. The e-mail was clearly written by Winkofsky to schedule a meeting between the Governor's office and GLI. Although Winkofsky, Mullally and Sabol are all attorneys, Winkofsky did not discuss any legal advice or strategy, only the scheduling issue. See *Center Partners*, 2012 IL 113107, ¶ 30; *Chicago Trust*, 298 Ill. App. 3d at 408-09. Consequently, the circuit court properly found this e-mail not protected by the attorney-client privilege.

¶ 80                                  4. Category Four Communications

¶ 81    The fourth category of communications included seven e-mails sent among Sabol, Winkofsky, Braun, Mattison, Mullally and Maida in late July and early August 2016. In one of those e-mails, Davis, the paralegal and assistant of Winkofsky, was blindcopied. The first two e-mails were exchanged on July 27, 2016. In the initial e-mail sent by Winkofsky, he merely summarized a conversation he had with Mullally, specifically the idea of scheduling a training with members of the Board led by two of GLI's "operational guys," presumably LaBrocca and Kornett. And in response to that e-mail, Sabol merely commented that she thought a training was a good idea and proposed discussing the training and other items with "Mark," presumably again

Ostrowski. Simply put, there is nothing in these two e-mails related to legal advice or strategy. The third e-mail was sent by Winkofsky on July 29, 2016, and consisted of a summary of his meeting with Buske of the Governor's office earlier in the day. The summary included discussions of various items related to gaming in Illinois, including the debate regarding single- or multiple-source certification and the possibility of a training with members of the Board. Again, there is nothing in this e-mail related to legal advice or strategy. The information in this e-mail is entirely related to GLI's business efforts. See *CNR Investments, Inc. v. Jefferson Trust & Savings Bank of Peoria*, 115 Ill. App. 3d 1071, 1076 (1983) ("The attorney-client privilege of confidentiality does not apply to documents discussing business advice instead of legal advice."). Moreover, the e-mail is a summary of a meeting with a third party, meaning the very information listed in the e-mail was discussed with Buske and not confidential. See *Illinois Education*, 204 Ill. 2d at 467 (observing that for communications to be protected by the attorney-client privilege, the communication must be "made in confidence" by the client).

¶ 82    The fourth e-mail was sent by Sabol on August 3, 2016, and summarized a meeting she had with Ostrowski earlier in the day. The summary included a discussion of the forthcoming procurement process, the positions of various Board members related to the procurement process and GLI's desire to hold an educational session with the Board. As with the previous Category Four e-mails, nothing here pertained to any legal advice or strategy. Rather, the communication pertained to business issues between GLI and the Board. See *CNR Investments*, 115 Ill. App. 3d at 1076 ("The attorney-client privilege of confidentiality does not apply to documents discussing business advice instead of legal advice."). The final three e-mails, one sent by Winkofsky on August 5, 2016, one sent by him on August 11, 2016, and one sent by Mullally on August 11, 2016, all involve various scheduling issues about the various proposed meetings. The e-mails are

not legal in nature, and they contain no discussion or request for legal advice. Consequently, the circuit court properly found these e-mails not protected by the attorney-client privilege.

¶ 83    Nevertheless, GLI raises several arguments about how the circuit court made various errors in reaching its decision that the communications were not protected by the attorney-client privilege, including that the court ignored the circumstances surrounding the communications. However, as noted, we review whether communications are privileged *de novo*. *Adler*, 2013 IL App (1st) 121066, ¶ 40. Under *de novo* review, "we perform the same analysis that a trial court would perform" (*id.*), meaning the manner the circuit court took in reaching its decision is irrelevant to our consideration of the issue. In our independent consideration of the issue, we have reviewed the communications in conjunction with the affidavits produced by GLI and its informal offers of proof. And even when considering the context of these communications, we find that they are not protected by the attorney-client privilege. In sum, the circuit court correctly concluded that the 11 e-mails and single attachment were not privileged and therefore properly ordered GLI to produce them to BMM.

¶ 84                                    E. Contempt Finding

¶ 85    Additionally, GLI requests that, in the event we uphold the discovery order, we should still vacate the civil contempt finding because its refusal to comply with the discovery order was a good-faith effort to facilitate appellate review of the order. Although BMM does not expressly address GLI's request, BMM in its conclusion argues that the contempt finding should be affirmed.

¶ 86    The use of a contempt finding in order to facilitate immediate appellate review of a discovery order is a common legal tactic and does not necessarily evince contemptuous conduct. *Brown*, 2017 IL App (1st) 161918, ¶ 28. Where the appellate court finds that a party's refusal to comply with a discovery order and produce documents was made in good faith based on sound

legal arguments in order to facilitate appellate review, we may vacate the civil contempt finding and monetary penalty despite upholding the discovery order. *Id.* We find such circumstances present in this case and vacate the circuit court's order finding GLI in civil contempt of court and assessing a monetary penalty for failing to produce the e-mails to BMM.

¶ 87    Lastly, although we have concluded that Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016) limits our review of this case to only the contempt finding and related discovery order, GLI can certainly raise the alleged mootness of the entire cause of action based on the amendments to the Gaming Act and Gambling Act on remand to the circuit court.

¶ 88                              III. CONCLUSION

¶ 89    For the foregoing reasons, we affirm the circuit court's discovery order, but vacate the court's order which found GLI in civil contempt and assessed a monetary penalty.

¶ 90    Discovery order affirmed; contempt order vacated.